**Case Nos. 23-11319, 23-11541**

## IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

IN RE: JOHNSON & JOHNSON AEROSOL SUNSCREEN
MARKETING, SALES PRACTICES
AND PRODUCTS LIABILITY LITIGATION

KATHERINE BRENNAN,
individually and on behalf of all others similarly situated, *et al.*,
Plaintiffs-Appellees/Cross-Appellants,
v.
JOHNSON & JOHNSON CONSUMER INC., *et al.*,
Defendants-Appellees,

THEODORE H. FRANK,
Interested Party-Appellant/Cross-Appellee.

On Appeal from the United States District Court
for the Southern District of Florida
No. 0:21-md-03015-AHS

### Appellant Frank's Opening Brief

Theodore H. Frank
John M. Andren
HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
1629 K Street NW, Suite 300
Washington, DC 20006
(703) 203-3848
ted.frank@hlli.org
*Attorneys for Appellant/Cross-Appellee Theodore H. Frank*

Case Nos. 23-11319 and 23-11541

*In re Johnson & Johnson Aerosol Sunscreen Litig.*

**Certificate of Interested Persons and Corporate Disclosures**

Under Cir. R. 28-1(b) and Fed. R. App. P. 26.1, Theodore H. Frank declares that he is an individual and, as such, is not a subsidiary or affiliate of a publicly owned corporation and there is no publicly held corporation that owns ten percent or more of any stock issued by him.

Under Cir. R. 28-1(b) and Cir. R. 26.1-2, the following trial judges, attorneys, persons, association of persons, firms, partnerships, and corporations are believed to have an interest in the outcome of this case or appeal:

1. Andren, John M., Hamilton Lincoln Law Institute, Attorney for Interested Party-Appellant/Cross-Appellee

2. Aveeno, Defendant-Appellee

3. Aylstock, Bryan Frederick, Aylstock Witkin Kreis & Overholtz PLLC, Attorney for Plaintiffs-Appellees/Cross-Appellants

4. Aylstock Witkin Kreis & Overholtz PLLC, Attorneys for Plaintiffs-Appellees/Cross-Appellants

5. Baker, Tyler, Plaintiff-Appellee/Cross-Appellant

6. Barich, Judith, Plaintiff-Appellee/Cross-Appellant

7. Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., Attorneys for Plaintiffs-Appellees/Cross-Appellants

8. Beasley, Allen Law Firm, Attorneys for Plaintiffs-Appellees/Cross-Appellants

Case Nos. 23-11319 and 23-11541

*In re Johnson & Johnson Aerosol Sunscreen Litig.*

9.   Berman, Bruce J., Carlton Fields, PA, Attorney for Defendants-Appellees

10.  Bodine, Robert Alexander, Plaintiff-Appellee/Cross-Appellant

11.  Botterill, Robert, Plaintiff-Appellee/Cross-Appellant

12.  Bradley/Grombacher LLP, Attorneys for Plaintiffs-Appellees/Cross-Appellants

13.  Brennan, Katherine, Plaintiff-Appellee/Cross-Appellant

14.  Briglio, Julianna, Plaintiff-Appellee/Cross-Appellant

15.  Buchanan, Michael F., Patterson Belknap Webb & Tyler, LLP, Attorney for Defendants-Appellees

16.  Bursor & Fisher, P.A., Attorneys for Plaintiffs-Appellees/Cross-Appellants

17.  Byrne, III, David B., Beasley, Allen Law Firm, Attorney for Plaintiffs-Appellees/Cross-Appellants

18.  Carlson Lynch, LLP, Attorneys for Plaintiffs-Appellees/Cross-Appellants

19.  Carlton Fields, PA, Attorneys for Defendants-Appellees

20.  Carella, Bryne, Cecchi, Olstein, Brody & Agnello, P.C., Attorneys for Plaintiffs-Appellees/Cross-Appellants

21.  Carroll, Katrina, Carlson Lynch, LLP, Attorney for Plaintiffs-Appellees/Cross-Appellants

22.  Casaliggi, Dina, Plaintiff-Appellee/Cross-Appellant

Case Nos. 23-11319 and 23-11541

*In re Johnson & Johnson Aerosol Sunscreen Litig.*

23. Cecchi, James E., Carella, Bryne, Cecchi, Olstein, Brody & Agnello, P.C., Attorney for Plaintiffs-Appellees/Cross-Appellants

24. Channick, Kimberly, Walsh Law PLLC, Attorney for Plaintiffs-Appellees/Cross-Appellants

25. Chun, Brian H., Lafayette & Kumagai LLP, Attorney for Defendants-Appellees

26. Cohen, Andrew, Patterson Belknap Webb & Tyler, LLP, Attorney for Defendants-Appellees

27. Costco Wholesale Corporation ("COST"), Defendant-Appellee

28. Dominguez, Johanna, Plaintiff-Appellee/Cross-Appellant

29. Dickerson, Charity, Plaintiff-Appellee/Cross-Appellant

30. Dickerson, Jerl, Plaintiff-Appellee/Cross-Appellant

31. Dickerson, Rebecca, Plaintiff-Appellee/Cross-Appellant

32. Dickerson, Ryan, Plaintiff-Appellee/Cross-Appellant

33. Dravillas, Alex, Keller Postman LLC, Attorney for Plaintiffs-Appellees/Cross-Appellants

34. Ellingson, Halle, Plaintiff-Appellee/Cross-Appellant

35. Emert, Mellissa R., Kantrowitz Goldhamer & Graifman, P.C., Attorney for Plaintiffs-Appellees/Cross-Appellants

36. Fernandez, Minett, Plaintiff-Appellee/Cross-Appellant

37. Fisher, Lawrence Timothy, Bursor & Fisher, P.A., Attorney for Plaintiffs-Appellees/Cross-Appellants

Case Nos. 23-11319 and 23-11541

*In re Johnson & Johnson Aerosol Sunscreen Litig.*

38. Frank, Theodore H., Interested Party-Appellant/Cross-Appellee and Hamilton Lincoln Law Institute, Attorney for Interested Party-Appellant/Cross-Appellee

39. French, Shelli, Plaintiff-Appellee/Cross-Appellant

40. Geloso, Christina, T., Plaintiff-Appellee/Cross-Appellant

41. Glover, Christopher Dean, Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., Attorney for Plaintiffs-Appellees/Cross-Appellants

42. Goodwin, Christine, Plaintiff-Appellee/Cross-Appellant

43. Graifman, Gary S., Kantrowitz Goldhamer & Graifman, P.C., Attorney for Plaintiffs-Appellees/Cross-Appellants

44. Granda, Kelly, Plaintiff-Appellee/Cross-Appellant

45. Gravante, III, John, Podhurst Orseck, P.A., Attorney for Plaintiffs-Appellees/Cross-Appellants

46. Grombacher, Kiley L., Bradley/Grombacher LLP, Attorney for Plaintiffs-Appellees/Cross-Appellants

47. Grisham, Carman, Plaintiff-Appellee/Cross-Appellant

48. Hall, Kurt, Plaintiff-Appellee/Cross-Appellant

49. Hamilton Lincoln Law Institute, Attorneys for Interested Party-Appellant/Cross-Appellee

50. Harper, Lauren, Plaintiff-Appellee/Cross-Appellant

51. Harrell, Kyra, Plaintiff-Appellee/Cross-Appellant

52. Honik LLC, Attorneys for Plaintiffs-Appellees/Cross-Appellants

53. Humphreys, Heidi, Plaintiff-Appellee/Cross-Appellant

Case Nos. 23-11319 and 23-11541

*In re Johnson & Johnson Aerosol Sunscreen Litig.*

54.  Jimenez, Melissa, Plaintiff-Appellee/Cross-Appellant

55.  Johnson, Bennett, Plaintiff-Appellee/Cross-Appellant

56.  Johnson & Johnson ("JNJ"), Defendant-Appellee

57.  Johnson & Johnson Consumer Inc., Defendant-Appellee

58.  Johnson & Johnson Consumer Companies, Inc., Defendant-Appellee

59.  Kantrowitz Goldhamer & Graifman, P.C., Attorneys for Plaintiffs-Appellees/Cross-Appellants

60.  Keller Postman LLC, Attorneys for Plaintiffs-Appellees/Cross-Appellants

61.  Kenvue Inc. ("KVUE"), Defendant-Appellee's Publicly Traded Parent Corporation

62.  Knobler, Jonah, Patterson Belknap Webb & Tyler, LLP, Attorney for Defendants-Appellees

63.  Lafayette, Gary T., Lafayette & Kumagai LLP, Attorney for Defendants-Appellees

64.  Lafayette & Kumagai LLP, Attorneys for Defendants-Appellees

65.  Lavalle, Steven, Plaintiff-Appellee/Cross-Appellant

66.  Lerner, Kellie, Robins Kaplan LLP, Attorney for Plaintiffs-Appellees/Cross-Appellants

67.  Levin, Sedran & Berman LLP, Attorneys for Plaintiffs-Appellees/Cross-Appellants

68.  Lokietz, Marcy, Plaintiff-Appellee/Cross-Appellant

Case Nos. 23-11319 and 23-11541

*In re Johnson & Johnson Aerosol Sunscreen Litig.*

69. Lyons, Barbara Louise, Law Office of Barbara Lyons, Attorney for Defendants-Appellees

70. Law Office of Barbara Lyons, Attorneys for Defendants-Appellees

71. Magagna, David C., Levin, Sedran & Berman LLP, Attorney for Plaintiffs-Appellees/Cross-Appellants

72. Mang, Michelle, Plaintiff-Appellee/Cross-Appellant

73. McLaughlin, Timothy, Plaintiff-Appellee/Cross-Appellant

74. Meijer, Sharron, Plaintiff-Appellee/Cross-Appellant

75. Melquist, Kyle, Plaintiff-Appellee/Cross-Appellant

76. Meyer, Seth A., Keller Postman LLC, Attorney for Plaintiffs-Appellees/Cross-Appellants

77. Neubauer, Mark A., Carlton Fields, PA, Attorney for Defendants-Appellees

78. Neutrogena Corporation, Defendant-Appellee

79. Nokes, Annette, Plaintiff-Appellee/Cross-Appellant

80. Obergfell, Andrew Joseph, Bursor & Fisher, P.A., Attorney for Plaintiffs-Appellees/Cross-Appellants

81. Ocampo, Catalina, Plaintiff-Appellee/Cross-Appellant

82. Ortega, Frank, Plaintiff-Appellee/Cross-Appellant

83. Paspulati, Saisruthi S., Lafayette & Kumagai LLP, Attorney for Defendants-Appellees

84. Patterson Belknap Webb & Tyler, LLP, Attorneys for Defendants-Appellees

Case Nos. 23-11319 and 23-11541

*In re Johnson & Johnson Aerosol Sunscreen Litig.*

85. Pedron, Roxanne M., Plaintiff-Appellee/Cross-Appellant

86. Podhurst Orseck, P.A., Attorney for Plaintiff-Appellee/Cross-Appellants

87. Porter, Sophia, Plaintiff-Appellee/Cross-Appellant

88. Postman, Warren D., Keller Lenker LLC, Attorney for Plaintiffs-Appellees/Cross-Appellants

89. Poulin, Eric M., Poulin Willey Anastopoulo LLC, Attorney for Plaintiff-Appellee/Cross-Appellants

90. Poulin Willey Anastopoulo LLC, Attorney for Plaintiff-Appellee/Cross-Appellants

91. Prieto, Peter, Podhurst Orseck, P.A., Attorney for Plaintiff-Appellee/Cross-Appellants

92. Rafal, George B., Plaintiff-Appellee/Cross-Appellant

93. Richards, Robert Jason, Aylstock Witkin Kreis & Overholtz PLLC, Attorney for Plaintiffs-Appellees/Cross-Appellants

94. Robins Kaplan LLP, Attorneys for Plaintiffs-Appellees/Cross-Appellants

95. Rudy, Heather, Plaintiff-Appellee/Cross-Appellant

96. Rumberger, Timothy Paul, Law Offices of Timothy P. Rumberger, Attorney for Plaintiffs-Appellees/Cross-Appellants

97. Law Offices of Timothy P. Rumberger, Attorneys for Plaintiffs-Appellees/Cross-Appellants

98. Salter, Fredric, Plaintiff-Appellee/Cross-Appellant

Case Nos. 23-11319 and 23-11541

*In re Johnson & Johnson Aerosol Sunscreen Litig.*

99.   Sander, Nicole, Plaintiff-Appellee/Cross-Appellant

100.  Serota, Meredith, Plaintiff-Appellee/Cross-Appellant

101.  Schaffer, Charles E., Levin, Sedran & Berman LLP, Attorney for Plaintiffs-Appellees/Cross-Appellants

102.  Shub, Jonathan, Shub Law Firm LLC, Attorney for Plaintiffs-Appellees/Cross-Appellants

103.  Shub Law Firm LLC, Attorneys for Plaintiffs-Appellees/Cross-Appellants

104.  Singhal, The Honorable Raag, United States District Judge for the Southern District of Florida

105.  Slafter, Brian, Plaintiff-Appellee/Cross-Appellant

106.  Somers, Jacob, Plaintiff-Appellee/Cross-Appellant

107.  Stolzenbach, Samantha, Plaintiff-Appellee/Cross-Appellant

108.  Stanoch, David J., Honik LLC, Attorney for Plaintiffs-Appellees/Cross-Appellants

109.  Sultzer, Jason, The Sultzer Law Group, P.C., Attorney for Plaintiffs-Appellees/Cross-Appellants

110.  The Sultzer Law Group, P.C., Attorneys for Plaintiffs-Appellees/Cross-Appellants

111.  Swartz, Anna, Plaintiff-Appellee/Cross-Appellant

112.  Taillard, Michael, Plaintiff-Appellee/Cross-Appellant

113.  Trainor, Sharon, Plaintiff-Appellee/Cross-Appellant

114.  Vaidis, Stacey, Plaintiff-Appellee/Cross-Appellant

Case Nos. 23-11319 and 23-11541
*In re Johnson & Johnson Aerosol Sunscreen Litig.*

115. Walsh, Alexandra M., Walsh Law PLLC, Attorney for Plaintiffs-Appellees/Cross-Appellants

116. Walsh Law PLLC, Attorneys for Plaintiffs-Appellees/Cross-Appellants

117. Weinshall, Matthew, Podhurst Orseck, P.A., Attorney for Plaintiff-Appellee/Cross-Appellant

118. Weiss, Aaron Stenzler, Carlton Fields, PA, Attorney for Defendants-Appellees

119. Wiley, IV, Roy T., Poulin Willey Anastopoulo LLC, Attorney for Plaintiff-Appellee/Cross-Appellant

120. Xavier, Mike, Plaintiff-Appellee/Cross-Appellant

121. Zalesin, Steven A., Patterson Belknap Webb & Tyler, LLP, Attorney for Defendants-Appellees


Dated: July 5, 2023

*/s/ Theodore H. Frank*
Theodore H. Frank
John M. Andren
Hamilton Lincoln Law Institute
Center for Class Action Fairness
1629 K Street NW, Suite 300
Washington, DC 20006
Telephone: (703) 203-3848
Email: ted.frank@hlli.org
        john.andren@hlli.org

*Attorneys for Objector-Appellant*
*Theodore H. Frank*

## Statement in Support of Oral Argument

As Cir. R. 28-1(c) permits, Appellant Theodore H. Frank asks the Court to hear oral argument because this appeal presents significant issues about Article III jurisdiction and class settlement approval and certification. These issues are meritorious, and pit the district court's decision against the plain text of Rule 23 and 28 U.S.C. §1712, as well as the decisions of other Circuits.

The exploration at oral argument of these complex but recurring questions of civil procedure would aid this Court's decisional process and benefit the judicial system. Frank's nonprofit has argued and won landmark appellate rulings on similar issues. *E.g.*, *Frank v. Gaos*, 139 S. Ct. 1041 (2019); *Williams v. Reckitt Benckiser LLC*, 65 F.4th 1243 (11th Cir. 2023); *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 609 (9th Cir. 2021); *Briseño v. Henderson*, 998 F.3d 1014 (9th Cir. 2021); *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014); *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014); *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013); *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011). Frank is an experienced appellate advocate and a member of the American Law Institute; he has argued before the Supreme Court. A favorable resolution here would improve the class-action process by deterring other class-action settlements designed to benefit attorneys at the expense of their putative clients.

# Table of Contents

Certificate of Interested Persons and Corporate Disclosures ............. C-1

Statement in Support of Oral Argument .................................................... i

Table of Contents ...................................................................................... ii

Table of Citations .................................................................................... v

Jurisdictional Statement ......................................................................... xii

I.    District court jurisdiction ............................................................. xii

    A.    The district court has subject-matter jurisdiction. ............. xii

    B.    Because plaintiffs did not have Article III standing to seek prospective injunctive relief, the district court lacked jurisdiction to approve the settlement and release of those claims. ............................................. xiii

II.    Appellate jurisdiction ................................................................. xvi

Statement of the Issues ............................................................................. 1

Statement of the Case ............................................................................... 3

    A.    Valisure discovers benzene in J&J sunscreen products and plaintiffs file suit ............................................................ 3

    B.    The parties agree to a coupon settlement .............................. 5

    C.    Frank objects. ........................................................................ 8

    D.    The district court approves the settlement and fee request, but does not address several Frank objections. ..... 10

    E.    Standard of review ............................................................... 14

Summary of Argument........................................................................... 15

Argument............................................................................................... 17

I.    Because plaintiffs did not demonstrate Article III standing to seek prospective injunctive relief, the district court did not have jurisdiction to adjudicate a settlement releasing those claims........................................................................................... 17

II.   Because of agency problems in class-action settlements, Rule 23(e)(2)(C) requires scrutiny to prevent class counsel from self-dealing at the expense of absent class members and to ensure fair allocation of benefits regardless of the settlement size.............................................................................. 20

    A.    The district court erred as a matter of law when it failed to address Rule 23(e)(2)(C) factors not listed in *Bennett*................................................................................. 20

    B.    Rule 23(e)(2)(C) requires courts to be wary of the allocation of a class-action settlement. ................................. 22

III.  The settlement approval cannot stand because class counsel negotiated $2.6 million for themselves in a settlement that provides the class likely less than $1 million of redeemed value in coupon relief. .................................................. 30

    A.    Disproportionate allocation violates Rule 23(e)(2)(C) even without a showing of actual collusion. ......................... 31

    B.    The district court's unexplained settlement valuation is legally erroneous. ............................................................... 35

        1.    The vouchers are worth less than face value because many, and perhaps most, coupons will not be redeemed. 36

        2.    A refund program that ended before the class received notice is not a settlement benefit. ..................................... 37

    3.   Prospective injunctive relief must benefit the class—not hypothetical future consumers...........................................40

IV.   The settlement's coupon relief mandates applying 28 U.S.C. §1712, and the district court erred in failing to acknowledge the presence of coupon relief in the settlement............................47

V.   The district court abused its discretion by relying on facts common to all class-action settlements and thus irrelevant to settlement fairness or class certification.......................................50

Conclusion ...............................................................................53

Addendum of Statutes and Rules .........................................55

Certificate of Compliance ....................................................58

# Table of Citations

## Cases

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
421 U.S. 240 (1975) ........................................................................ 41

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ........................................................................ 52

*In re Aqua Dots Prod. Liab. Litig.*,
654 F.3d 748 (7th Cir. 2011) ......................................................... 38

*Arkin v. Pressman*,
38 F.4th 1001 (11th Cir. 2022) ............................................... 24, 30

*Bankers Tr. Co. v. Mallis*,
435 U.S. 381, 98 S. Ct. 1117 (1978)........................................... xvi

*Bennett v. Behring Corp.*,
737 F.2d 982 (11th Cir. 1984) .................................... 20-21, 32, 50

*In re Bluetooth Headset Prod. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) .............. i, 14, 25-26, 29, 33, 42-43, 50

*Briseño v. Henderson*,
998 F.3d 1014 (9th Cir. 2021)
.............................................. i, 1, 7-8, 10, 15, 24-25, 29, 32-34, 51-52

*Camden I Condo. Ass'n, Inc. v. Dunkle*,
946 F.2d 768 (11th Cir. 1991) ................................................. 25-26

*In re Checking Account Overdraft Litig.*,
830 F. Supp. 2d 1330 (S.D. Fla. 2011) ..................................... 31-32

*Citizens for Police Accountability Pol. Comm. v. Browning*,
572 F.3d 1213 (11th Cir. 2009) ..................................................... 14

*In re Corrugated Container Antitrust Litig.*,
  643 F.2d 195 (5th Cir. 1981) ......................................................... 51

*Dardarian v. Officemax N. Am., Inc.*,
  No. 11-cv-00947,
  2013 U.S. Dist. LEXIS 98653 (N.D. Cal. July 12, 2013) .............. 48

*Day v. Persels & Assocs., LLC*,
  729 F.3d 1309 (11th Cir. 2013) ..................................................... 13

*Devlin v. Scardelletti*,
  536 U.S. 1 (2002) .......................................................................... xvii

*In re Dry Max Pampers Litig.*,
  724 F.3d 713 (6th Cir. 2013)
    ................................................ i, 16, 23-25, 29, 33, 36, 39-40, 43, 51

*Duty Free Ams., Inc. v. Estee Lauder Cos.*,
  797 F.3d 1248 (11th Cir. 2015) ................................................ xiv-xv

*In re EasySaver Rewards Litig.*,
  906 F.3d 747 (9th Cir. 2018) .......................................................... 49

*In re Equifax Customer Data Sec. Breach Litig.*,
  999 F.3d 1247 (11th Cir. 2021) ................................................ 32, 50

*Faught v. Am. Home Shield Corp.*,
  668 F.3d 1233 (11th Cir. 2011) ................................................ 44, 46

*Frank v. Gaos*,
  139 S. Ct. 1041 (2019) ........................................................i, xiii, 17

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995).......................................................... 14, 33

*In re Groupon Mktg. & Sales Practices Litig.*,
  593 F. App'x 699 (9th Cir. 2015) ................................................... 38

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ......................................................... 44

*Hendricks v. Ference*,
    754 Fed. Appx. 510 (9th Cir. 2018) ................................................. 48

*Holmes v. Cont'l Can Co.*,
    706 F.2d 1144 (11th Cir. 1983) ........................................... 14-15, 23

*\*Johnson v. NPAS Sols, LLC*,
    975 F.3d 1244 (11th Cir. 2020),
    *cert. denied sub nom. Dickenson v. Johnson*,
    No. 22-517 (U.S. Apr. 17, 2023)................................... 13, 17, 21, 31

*In re Katrina Canal Breaches Litig.*,
    628 F.3d 185 (5th Cir. 2010) ........................................................ 47

*Kim v. Allison*,
    8 F.4th 1170 (9th Cir. 2021) ......................................................... 24

*Koby v. ARS Nat'l Servs.*,
    846 F.3d 1071 (9th Cir. 2017) ................................................. 38, 44

*Koon v. U.S.*,
    518 U.S. 81 (1996) ........................................................................ 14

*Kouichi Taniguchi v. Kan Pac. Saipan, Ltd.*,
    566 U.S. 560 (2012) .................................................................. 47-48

*Luevano v. Wal-Mart Stores, Inc.*,
    722 F.3d 1014 (7th Cir. 2013) ...................................................... xvi

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................... xv, 18

*McKinney-Drobnis v. Oreshack*,
    16 F.4th 594 (9th Cir. 2021)............................................i, 14, 48-49

*Mertinez-Mendoza v. Champion Int'l Corp.*,
    340 F.3d 1200 (11th Cir. 2003) ..................................................... xvi

*Mirfasihi v. Fleet Mortg. Corp.*,
    356 F.3d 781 (7th Cir. 2004) ........................................................ 43

*\*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014)
     ........................................................ i, 8, 24-25, 28-29, 32-34, 42, 52

*Pettway v. Am. Cast Iron Pipe Co.*,
    576 F.2d 1157 (5th Cir. 1978) ...................................................... 23

*Piambino v. Bailey*,
    757 F.2d 1112 (11th Cir. 1985) ................... 21, 23-24, 30, 33, 41-42

*Prado-Steiman ex rel. Prado v. Bush*,
    221 F.3d 1266 (11th Cir. 2000) .............................................. xvi, 19

*\*Redman v. RadioShack Corp.*,
    768 F.3d 622 (7th Cir. 2014) ................................... i, 26, 29, 48, 51

*Reed v. Cont'l Guest Servs. Corp.*,
    No. 10 Civ. 5642, 2011 WL 1311886 (S.D.N.Y. Apr. 4, 2011) ........ 27

*Roes v. SFBSC Mgmt., LLC*,
    944 F.3d 1035 (9th Cir. 2019) ................................................. 25, 29

*Serota v. Johnson & Johnson Consumer Inc.*,
    No. 21-cv-61103-AHS (S.D. Fla.) ..................... xii-xvi, 3-5, 17-19, 43

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ..................................................................... 41

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) .................................................. 28, 33

*Synfuel Technologies, Inc. v. DHL Express (USA), Inc.,
    463 F.3d 646 (7th Cir. 2006) ............................................... 16, 40, 46

In re TD Ameritrade Accountholder Litig.,
    266 F.R.D. 418 (N.D. Cal. 2009) ................................................42-43

Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship,
    874 F.3d 692 (11th Cir. 2017) ......................................................... 30

Tyson Foods, Inc. v. Bouaphakeo,
    136 S. Ct. 1036 (2016) .................................................................... 42

United States v. Irey,
    612 F.3d 1160 (11th Cir. 2010) (en banc)................................. 14, 53

*Williams v. Reckitt Benckiser LLC,
    65 F.4th 1243 (11th Cir. 2023)
      .................................... i, xiv-xvii, 1, 7-8, 12, 15, 17-19, 21, 32-33, 52

Wright Transp., Inc. v. Pilot Corp.,
    841 F.3d 1266 (11th Cir. 2016) ...................................................... 14

## Rules, Statutes, and Constitutional Provisions

11th Cir. R. 28-1(c) ..............................................................................i

28 U.S.C. §1291 ................................................................................xvi

28 U.S.C. §1332(d)(2) ........................................................................xii

*28 U.S.C. §1712 (Class Action Fairness Act)
      .....................................................i, 2, 9, 13, 16-17, 47-49

28 U.S.C. §1712(a) ........................................................................... 47

28 U.S.C. §1712(c) ........................................................................... 47

28 U.S.C. §1712(e) ....................................................................... 27

Fed. R. App. P. 4(a)(1)(A) ........................................................... xvii

Fed. R. App. P. 4(a)(3) ................................................................ xvii

Fed. R. App. P. 4(a)(7)(A)(ii) ...................................................... xvii

Fed. R. App. P. 4(a)(7)(B) ........................................................... xvii

Fed. R. Civ. P. 23 ............................................... i, 6, 21-22, 41-42

Fed. R. Civ. P. 23(b) ....................................................................... 52

Fed. R. Civ. P. 23(b)(2) ................................................................. 44

Fed. R. Civ. P. 23(b)(3) ........................................................... 51-52

Fed. R. Civ. P. 23(e) ............................................................... 42, 52

Fed. R. Civ. P. 23(e)(1) ................................................................... 6

Fed. R. Civ. P. 23(e)(2) ....................................... 12, 20, 24, 32-34, 50, 53

Fed. R. Civ. P. 23(e)(2)(A) ........................................................... 21

Fed. R. Civ. P. 23(e)(2)(B) ........................................... 21, 24, 33-34

*Fed. R. Civ. P. 23(e)(2)(C) ..................... 1, 10, 12, 15, 20-22, 31-32. 52-53

Fed. R. Civ. P. 23(e)(2)(C)(i) ................................................. 21, 24

*Fed. R. Civ. P. 23(e)(2)(C)(ii) ........................................ 9, 12, 21, 28, 33

*Fed. R. Civ. P. 23(e)(2)(C)(iii) .................................. 9, 12, 21, 24, 31, 33

Fed. R. Civ. P. 23(h) ........................................................................ 7

Fed. R. Civ. P. 58(a) .................................................................... xvi

*U.S. Const., Art. III ................................. xiii-xvi, 1, 15, 17-19, 42, 45, 53

## Other Authorities

David, Larry,
   "The Non-Fat Yogurt," *Seinfeld* (NBC Nov. 4, 1993).................... 45

Erichson, Howard,
   *Aggregation as Disempowerment*,
   92 Notre Dame L. Rev. 859 (2016) .......................................... 25-26

Erichson, Howard M..
   *How to Exaggerate the Size of Your Class Action Settlement*,
   Daily Journal (Nov. 8, 2017) ....................................................... 25

S. Rep. 109-14 (2005),
   as reprinted in 2005 U.S.C.C.A.N. 3 ............................. 27-28, 41, 48

Schwartz, Victor E. & Christopher E. Appel,
   *Government Regulation and Private Litigation: The Law
   Should Enhance Harmony, Not War*,
   23 B.U. Pub. Int. L.J. 185 (2014) .................................................. 41

Sheley, Erin L. & Theodore H. Frank,
   *Prospective Injunctive Relief and Class Settlements*,
   39 Harv. J. L. & Pub. Pol'y 769 (2016)......................................... 42

Silver, Charles,
   *Due Process and the Lodestar Method*,
   74 Tulane L. Rev. 1809 (2000) ..................................................... 34

Webster's Ninth New Collegiate Dictionary (1988)........................ 48

## Jurisdictional Statement

## I.    District court jurisdiction.

### A.    The district court has subject-matter jurisdiction.

The district court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action where the amount in controversy exceeds $5,000,000 exclusive of costs; many class members in the nationwide class are citizens of states other than a defendant's state of citizenship; and no exception to the Class Action Fairness Act applies. For example, Johnson & Johnson Consumer Inc. is a New Jersey corporation with its principal place of business in New Jersey, and is thus a citizen of New Jersey; while named plaintiff Meredith Serota is a citizen of Florida. *Serota* Dkt.4 at 2-8 ("Complaint").[1]

---

[1] "Dkt." refers to the docket entries in MDL No. 3015, No. 0:21-md-03015-AHS (S.D. Fla.). "*Serota* Dkt." refers to the docket entries in *Serota v. Johnson & Johnson Consumer Inc.*, No. 21-cv-61103-AHS (S.D. Fla.). "Tr." refers to the August 12, 2022 fairness hearing transcript.

Plaintiffs filed the *Serota* complaint on July 30, 2021, before the MDL consolidation, and did not file a consolidated complaint on the MDL docket. *Cf.* Dkt.95 at 4 ¶10.

**B.    Because plaintiffs did not have Article III standing to seek prospective injunctive relief, the district court lacked jurisdiction to approve the settlement and release of those claims.**

The district court erroneously failed to conduct an Article III standing analysis. *Williams v. Reckitt Benckiser LLC*, 65 F.4th 1243, 1254 (11th Cir. 2023); *Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019). Because of this failure, the district court acted beyond the scope of its jurisdiction. If plaintiffs "lack Article III standing to pursue their claims against [J&J] for injunctive relief," the district court lacked jurisdiction to approve a settlement of those claims. *Williams*, 65 F.4th at 1254, 1256.

The complaint sought prospective relief "to enjoin and prevent [J&J] from … continuing to market and sell Sunscreen Products that may be adulterated with benzene." *Serota* Dkt.4 at 21 ¶36.  Plaintiffs alleged:

> Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary. Plaintiffs Serota and Somers are long time users of Defendant's Sunscreen Products, and they desire to purchase Defendant's Sunscreen Products in the future *if* they can be assured that the Sunscreen Products are unadulterated and meet the advertising claims. Absent injunctive relief, Defendant *may* continue to advertise, promote and sell adulterated Sunscreen Products that deceive the public as to their ingredients and safety. Plaintiffs Serota and Somers are thus likely to again be wronged in a similar way. For example, *if* Plaintiffs Serota and Somers encounter Defendant's Sunscreen Products in the future and ***there is a risk*** those

> products still contain benzene, they **_may_** mistakenly rely on the product's label to believe that Defendant's eliminated benzene when they did not.

*Serota* Dkt.4 at 25 ¶49 (emphasis added).

Plaintiffs also alleged that sunscreen products containing benzene are worthless:

> Plaintiffs Serota and Somers and Sub-Class members **_would have paid nothing_** for Sunscreen Products that have a risk of containing a known human carcinogen (i.e. benzene). Indeed, there is no discernible "market" for an over-the-counter sunscreen product that may be adulterated with a known human carcinogen. As recognized by the WHO, "[b]enzene is carcinogenic to humans, and no safe level of benzene can be recommended." As a result, the Defendant's Sunscreen Products are rendered **_valueless_**.

*Serota* Dkt.4 at 27 ¶59 (emphasis added); *see also id.* at 24-25 ¶47 ("[C]onsumers would not have paid for sunscreens potentially adulterated with benzene ….").

"The complaint alleges only *past* harm as a result of [defendant's] misrepresentations." *Williams*, 65 F.4th at 1254. "But '[t]he fact that [the Named Plaintiffs] may have been injured by [J&J's misleading statements and omissions] in the past … cannot be sufficient to establish an injury in fact that would support injunctive relief.'" *Id.* (*quoting Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1271-72 (11th Cir. 2015)). As in *Williams*, plaintiffs allege only speculative future harm

"plainly insufficient to establish a threat of imminent or actual harm." *Id.* at 1254-55 (discussing *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)). Unspecified plans to buy products cannot "be characterized as a 'concrete' or 'actual' injury because, by its very terms, it has not yet occurred, and indeed may never occur." *Duty Free Ams.*, 797 F.3d at 1272. And uncertainty over whether those unspecified plans will result in injury, based on speculation that a manufacturer *might* include an ingredient for which there is "no discernible 'market'" is a far cry from the concrete or actual injury required to bring a case or controversy to federal court.

Plaintiffs allege that they will suffer future harm only (1) ***if*** they "encounter" J&J sunscreen products in the future; ***and*** (2) those products still ***potentially*** contain benzene; ***and*** (3) plaintiffs ***may*** mistakenly rely on the product's label to believe the products no longer contain benzene. *Serota* Dkt.4 at 25 ¶ 49. The most experienced forecaster would struggle to compute the probability of all those independent events occurring, but we can rest assured "The conditional nature of the[] allegations compels the conclusion: any alleged harm … is 'conjectural [and] hypothetical,' not 'actual or imminent,' as Article III demands." *Williams*, 65 F.4th at 1255 (*quoting Lujan*, 504 U.S. at 560).

If the district court lacked Article III jurisdiction over the claims for prospective injunctive relief claims, it lacked jurisdiction to approve a settlement that included settlement of those claims. *Williams*, 65 F.4th at 1256-58. And then this Court would be "required to vacate the district

court's approval of the Settlement Agreement and remand this case to the district court for further proceedings." *Id.* at 1258. "[O]n remand, the court should account only for relief that the Named Plaintiffs have standing to pursue and that it has jurisdiction to grant when assessing the overall fairness of any settlement." *Id.*

Furthermore, "there is some question as to whether any Named Plaintiff has standing to raise certain claims of misrepresentations regarding" non-aerosol products covered by the settlement and complaint. *Williams*, 65 F.4th at 1260. "None of the Named Plaintiffs alleges that he or she purchased [these] Product[s]." *Id.*; *Serota* Dkt.4 at 3-10; *cf.* Dkt. 55-9 at 12 ¶22. A lack of standing on this ground would also independently preclude jurisdiction to approve the settlement. *Williams*, 65 F.4th at 1259-61; *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279-81 (11th Cir. 2000).

## II.    Appellate jurisdiction

This court has appellate jurisdiction under 28 U.S.C. § 1291 because this is a timely filed appeal from a final decision. On April 5, 2023, the district court issued an Order of Dismissal. Dkt.98.[2]

---

[2] The district court did not enter final judgment on a separate document in connection with its settlement approval order as Fed. R. Civ. P. 58(a) requires. But this Court can treat the appeal as one from a proper final judgment because there are "clear signal[s] from the district court" that it intended to issue a final order at least when it issued its Order of

Frank filed a notice of appeal on April 20, 2023. Dkt.99. This notice was timely under Fed. R. App. P. 4(a)(1)(A). Under Fed. R. App. P. 4(a)(3), Plaintiffs timely cross-appealed May 4, 2023. Dkt.102.

Class member Frank filed a timely objection to a proposed class-action settlement. Dkt.83. Objectors have standing to appeal a final approval of a class-action settlement without the need to intervene formally in the case. *Devlin v. Scardelletti*, 536 U.S. 1 (2002).

---

Dismissal. *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1020 (7th Cir. 2013); *see also Bankers Tr. Co. v. Mallis*, 435 U.S. 381, 384 (1978); *Mertinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1215 n.35 (11th Cir. 2003) ("where a district court treats the litigation as having ended—the court's judgment is final, and the appeal may go forward." (citation omitted)). In the alternative, the Rules consider the judgment entered 150 days after April 5, 2023, on Tuesday, September 5, 2023, and an appeal before then valid. Fed. R. App. P. 4(a)(7)(A)(ii), (B).

## Statement of the Issues

1.     A district court must assure itself of jurisdiction, even if no party raises it, and lacks jurisdiction to approve a settlement releasing claims for prospective injunctive relief when no named plaintiff has Article III standing to raise those claims. *Williams*, 65 F.4th at 1254-61. Did the district court have Article III jurisdiction to approve such a settlement when named plaintiffs failed to allege imminent or actual injury redressable by injunctive relief?

(Raised at Dkt.94-1 at 3-4; jurisdictional holding at Dkt.95 at 11.)

2.     Frank objected, and appellate courts agree, that the 2018 amendments creating Rule 23(e)(2)(C) require district courts to evaluate actual class recovery relative to class counsel recovery. *E.g.*, *Williams*, 65 F.4th at 1261; *Briseño v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021).

Did the lower court err as a matter of law in failing to evaluate the settlement under Rule 23(e)(2)(C); and by approving a settlement that awards class counsel a disproportionate fee larger than what the class receives, and includes terms favoring class counsel that *Williams* and *Briseño* identify as red flags?

(Raised at Dkt.83 at 16-23, Dkt.94-1 at 22-29; ruled on at Dkt.95 at 22-23.)

3.     Did the lower court legally err in crediting a refund program implemented before settlement as part of the settlement value, rather

than addressing and adopting appellate precedent and Frank's objection arguing that preexisting relief cannot be consideration for a settlement release?

(Raised at Dkt.83 at 8, 14, 19-21, and Dkt.94-1 at 21-22; ruled on at Dkt.95 at 28.)

4.    The settlement imposes prospective injunctive relief that applies equally to class members and non-class members alike, but does not affect class members who no longer do business with the defendant. Did the lower court commit legal error in crediting prospective, non-exclusive injunctive relief as a benefit to a class of past purchasers releasing damages claims?

(Raised at Dkt.83 at 19-21, 26, and Dkt.94-1 at 19-22; ruled on at Dkt.95 at 29.)

5.    Under the Class Action Fairness Act, 28 U.S.C. §1712 establishes rules for settlements with a recovery of coupons. Did the lower court err when it failed to apply §1712 to $4.98 "vouchers" that expire twelve months from their date of issue, or even to determine whether the vouchers were "coupons" under §1712?

(Raised at Dkt.83 at 14-19 and 24-25, Dkt.90 at 3, Dkt.94-1 at 12-16; ruled on *sub silentio* in Dkt.95.)

6.      Did the district court abuse its discretion when it gave undue weight to facts present in every large-scale class-action settlement?

(Raised at Dkt.83 at 14-25, Dkt.94-1; ruled on at Dkt.95 at 23-25, 29-30.)

## Statement of the Case

### A.    Valisure discovers benzene in J&J sunscreen products and plaintiffs file suit.

Defendant Johnson & Johnson Consumer Inc. sells Neutrogena and Aveeno branded sunscreen lotions and sprays.

On May 24, 2021, Valisure, an independent laboratory, filed a citizen petition with the Food & Drug Administration alleging certain J&J sunscreens contained high levels of benzene, and requested recalls. Dkt.95 at 2. The next day, plaintiffs filed a putative nationwide class-action complaint alleging consumer fraud injuries and unjust enrichment based on the alleged adulteration and mislabeling of Neutrogena products. *Serota* Dkt.1. Other plaintiffs filed other class-action complaints in multiple jurisdictions. Dkt.95 at 3.

On July 14, 2021, J&J announced it was voluntarily recalling all lots of five Neutrogena and Aveeno aerosol sunscreen product lines because benzene was detected in samples of the recalled products. The same day, J&J announced it would offer full cash refunds for the average

3

retail selling price of the affected products. It did not set a deadline for the refund program. Plaintiffs amended their complaint, asking for a broader recall and adding other consumer-law claims. *Serota* Dkt.4.

The United States Judicial Panel on Multidistrict Litigation centralized the various consumer actions that didn't allege personal injury in the Southern District of Florida. Dkt.1; Dkt.95 at 4.

Serota's amended complaint sought prospective relief "to enjoin and prevent [J&J] from … continuing to market and sell Sunscreen Products that may be adulterated with benzene." *Serota* Dkt.4 at 21 ¶36. Plaintiffs alleged:

> Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary. Plaintiffs Serota and Somers are long time users of Defendant's Sunscreen Products, and they desire to purchase Defendant's Sunscreen Products in the future if they can be assured that the Sunscreen Products are unadulterated and meet the advertising claims. Absent injunctive relief, Defendant may continue to advertise, promote and sell adulterated Sunscreen Products that deceive the public as to their ingredients and safety. Plaintiffs Serota and Somers are thus likely to again be wronged in a similar way. For example, if Plaintiffs Serota and Somers encounter Defendant's Sunscreen Products in the future and there is a risk those products still contain benzene, they may mistakenly rely on the product's label to believe that Defendant's eliminated benzene when they did not.

*Serota* Dkt.4 at 25 ¶49.

Plaintiffs also alleged that sunscreen products containing benzene are worthless:

> Plaintiffs Serota and Somers and Sub-Class members would have paid nothing for Sunscreen Products that have a risk of containing a known human carcinogen (i.e. benzene). Indeed, there is no discernible "market" for an over-the-counter sunscreen product that may be adulterated with a known human carcinogen. As recognized by the WHO, "[b]enzene is carcinogenic to humans, and no safe level of benzene can be recommended." As a result, the Defendant's Sunscreen Products are rendered valueless.

*Serota* Dkt.4 at 27 ¶59; *see also id.* at 24-25 ¶47. The complaint repeatedly alleged that no level of benzene was safe. *E.g.*, *id.* at 15. Though the complaint alleged wrongdoing with both aerosol and lotion sunscreens, it did not expressly allege that any named plaintiff was injured by the purchase of lotion products. *Serota* Dkt.4 at 3-10. Plaintiffs acknowledged that the claims against aerosol products were materially different from the claims against non-aerosol products. Dkt.55 at 30-31.

### B.    The parties agree to a coupon settlement.

Before the consolidation and any substantive litigation, the parties began mediation, and quickly settled in October 2021. Dkt.95 at 4-5. The

parties executed the settlement and moved for "preliminary approval"[3] on December 17, 2021. Dkt.55; Dkt.55-9.

The settlement releases the injunctive and economic loss claims of a single nationwide class of aerosol and non-aerosol product purchasers. Dkt.55-9 at 10, 12-13, 21-22. As relief, the settlement would distribute to claiming non-aerosol product purchasers "Vouchers" with a total face value of $1.75 million that can be used towards Neutrogena and Aveeno products and expire after twelve months (*id.* at 18-20 ¶¶53-55, 14 ¶42, 26 ¶82); and, for aerosol product purchasers, J&J agreed to an "extension" of the preexisting aerosol product refund program to January 14, 2022. *Id.* at 17-18 ¶51.

While class notice promised the coupons would have a face value of $10.59, the actual face value was only $4.98; the parties submitted no evidence about likely redemption rates. Dkt.87 at 11 (two stacked vouchers are worth $9.96); Dkt.94-1 at 6. J&J refunded aerosol customers about $9.53 million; but J&J had paid at least $9.28 million of that through its voluntary recall before the December 17 settlement. Dkt.82-1 at 10; Dkt.55-2 at 6. The parties never gave a precise accounting of the before and after, and the court did not ask for one.

---

[3] Although the district court issued "preliminary approval," Dkt.68, there is no such thing since the 2018 amendments to Rule 23, only a Rule 23(e)(1) decision to authorize settlement notice to the class.

The settlement agreement also provided prospective injunctive relief: forbidding J&J from selling any aerosol products they had already voluntarily recalled; and establishing for two years standards and procedures for the testing of raw materials for benzene, with a limit of one ppm (part per million). Dkt.55-9 at 16-17 ¶¶46-49. (There was also a putative injunction obligating J&J to test finished products, but that obligation expired in January 2022, before the settlement notice or any court orders regarding the settlement. *Id.*) The settlement and supporting papers did not reconcile this 1 ppm benzene limit with the complaint's allegation that no level of benzene is safe.

The settlement provided class counsel the right to seek $2.6 million in a Rule 23(h) award without objection from defendants; any reduction in the award from the $2.6 million J&J allocated would redound to defendants, rather than the class. Dkt.55-9 at 20-21 ¶¶60-64. Such protections for class counsel's Rule 23(h) request are known as "clear sailing" and "kicker" or "reverter" clauses. *E.g.*, *Williams*, 65 F.4th at 1261 (quoting *Briseño*, 998 F.3d at 1026-27).

The court ordered notice to the class in March 2022—after the settlement's putative "extension" of the refund program to January 14 had expired. Dkt.68.

At first class counsel acknowledged that the settlement was worth only a few million dollars. Dkt.77 at 2. But two weeks later, in making their fee request, Plaintiffs asserted they were entitled to a percentage of

$80 million, because that was the "financial impact" of its litigation on J&J, including the value of discarded recalled retail products and lost future sales; plaintiffs did not attempt to value the benefit of this deadweight loss to the class. Dkt.82-1 at 10-11.

### C.    Frank objects.

In July 2022, Theodore H. Frank objected to the proposed settlement and fee request. Dkt.83. Frank is an attorney nationally recognized for successfully litigating against abusive class-action settlements, winning cases such as *Briseño* and *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014), often as the class-member objector himself. Dkt.83-1 at 4-5. He argued *Williams* in this Court.

Frank was a class member who bought Neutrogena-branded sunscreen in both aerosol and lotion forms during the class period; he filed a timely claim under the settlement procedure. Dkt.83-1 at 2; Dkt.83-2; Dkt.83-3.

In his objection, Frank argued the settlement was unfair because most of the purported settlement value was illusory: the injunction provided no marginal benefit to class members not available to the world at large; contrary to appellate precedent, class counsel wanted to take credit for $9 million in refunds and $80 million in voluntary recall expenses that predated the settlement and would not be clawed back whether or not the court approved the settlement and its release; J&J's

recall expenses were not by themselves class benefits; and empirical data, including from previous settlements, showed that class members were unlikely to redeem the coupons. Because of this, the settlement did not satisfy the requirements of Rule 23(e)(2)(C)(ii) and (iii): the fee request was disproportionate to the relief that class members would receive, but self-serving "red flag" provisions in the settlement such as the clear-sailing clause and reverter to the defendant shielded that fee request from objection. Frank objected that this was especially problematic because the "vouchers" were coupons by another name, and the fee request flouted CAFA's restrictions on fee awards in coupon settlements. Dkt.83 at 14-22. Frank asked the Court to apply CAFA to the fee request in the alternative. *Id.* at 24-25.

Plaintiffs' response, filed over a month after Frank's objection and four days before the fairness hearing, relied mostly on *ad hominem* attacks on Frank and ignored the precedents he cited. Dkt.87; Dkt.90 at 3.

At the August 12 fairness hearing, Frank argued that the settlement could be approved only if the parties fixed its disproportionality. Tr. 32, 38, 42. "[T]he real question is what are they asking for in relation to what the class is receiving. And that here is $2.6 million in cash to the plaintiffs' lawyer, and $1.75 million, at best, in coupons to the class, with 97 percent of the class receiving nothing." *Id.* at 32. When asked by the court how the settlement could be better, Frank

noted that he was not complaining about the size of the relief, but its misallocation; and that the $4 million or so of settlement value should be reallocated to give the class a larger share. *Id.* at 38. He suggested the district court should apply *Briseño* and Rule 23(e)(2)(C). *Id.* at 42.

At the August 12 fairness hearing, J&J acknowledged that it incurred the expenses of the recall voluntarily. Tr. 21:8-22:21.

Frank submitted a detailed proposed order after the fairness hearing. Dkt.94-1.

## D. The district court approves the settlement and fee request, but does not address several Frank objections.

After the August 12 fairness hearing, the district court approved the settlement on February 27, 2023. Dkt.95. The court opens with this anecdote about Frank's objection and the fairness hearing: "The problem arises when in answer to the Court's question of what would make this settlement and award better or acceptable to the objector, the objector answered with a conclusory and somewhat flippant response of 'a better settlement.'" *Id.* at 2. The court's quoted flippant language appears nowhere in the fairness hearing transcript. Rather, as discussed above, Frank's counsel proposed reallocating the disproportionate settlement amount to be consistent with Rule 23(e)(2)(C) so that the class would receive more and the attorneys would receive less. Tr. 38. The court's opinion never addresses this proposed solution, instead recounting an exchange that never happened, calling Frank's argument "conclusory"

without discussing the appellate decisions and reasoning that had adopted it, and concluding that "complaining about a problem without posing a solution is called whining." Dkt.95 at 25.

The "Court finds that Mr. Frank's objection does not merit rejection of the Settlement." Dkt.95 at 24. The court found it "nearly dispositive" that Frank was the only objector. *Id.* at 23-24 (quotation and citation to district-court precedent omitted). The court was also impressed by the fact that there was "no opposition to Settlement Plaintiffs' motion for preliminary approval" decided without any notice to individual class members. *Id.* at 29-30.

As for Frank's argument (Dkt.83 at 18-21) that appellate precedent precluded including actions already taken as part of the valuation of settlement benefit, the district court called this a "conclusory statement" with "zero evidence." Dkt.95 at 24.

For valuation, the district court asserted without explanation that class counsel's $2.5 million fee request "will represent approximately one-third of the common fund," noting that putative one-third figure reasonable under Circuit precedent. Dkt.95 at 28 (citing cases). The court gave no explanation why it held the common fund to be worth around $7.5 million or why it rejected Frank's valuation arguments. The number does not appear in class counsel's papers either. The court did not explain how it valued each of the component coupon relief, refund, and injunctive relief. The court was impressed that the $2.6 million award was a fraction

of what it would cost for the 209,000 claimants to each hire an individual attorney to bring their own suit—and less than what Elizabeth Holmes paid her attorneys who "deserved to be paid." Dkt.95 at 25. "Claimants availed themselves of top lawyers without leaving their homes or even spending one dime." *Id.*

The district court noted the settlement's prospective injunctive relief (though incorrectly described it as establishing a 0.1 ppm benzene limit, and did not mention that some obligations of the injunctive relief had expired before the fairness hearing). *Compare* Dkt.95 at 7 *with* Dkt.55-9 at 16-17.

According to the district court, "[t]he requested award is inclusive of not only all Class Counsel's fees, but also reimbursement of all litigation expenses (other than the cost of administration and notice, which [J&J] is paying directly) as well as the value of the non-monetary/injunctive relief obtained on behalf of the Class." Dkt.95 at 27. The district court then cited the district-court opinion that *Williams* vacated; its parenthetical implies that the court included the injunctive relief as "part of the settlement pie." *Id.* It also noted the "significant value of the changed business practices" as justifying the fee award. *Id.* at 29.

The court noted its duty to assess the settlement under Rule 23(e)(2), Dkt.95 at 19, but when it came to the Rule 23(e)(2)(C)

factors, it failed to address Frank's arguments about (C)(ii) or (iii). *Id.* at 19-23.

The district court noted with apparent exasperation that its order "was a long time coming" and would have been issued sooner "[w]ere it not for the sole objection" by Frank, and spoke of the voluminous materials it reviewed (Dkt.95 at 2, 10), but it did not address many issues raised in Frank's objection. In addition to the arguments mentioned immediately above, the court's opinion did not address whether the "vouchers" were "coupons" for CAFA purposes, and did not apply CAFA. Nor did it address Frank's argument about class certification other than to say that Frank's objection was "overruled." Dkt. 95 at 30.

Citing this Court's rejection of lead-plaintiff incentive awards, the district court "retain[ed] jurisdiction to allow Plaintiffs to renew the request for incentive awards if [*Johnson v. NPAS Sols, LLC*, 975 F.3d 1244 (11th Cir. 2020)] ultimately is overruled." Dkt.95 at 29 n.8. The district court administratively closed the case and issued an order of dismissal on April 5. Dkt.97; Dkt.98. (The Supreme Court later denied the *Dickenson v. Johnson certiorari* petition. No. 22-517 (Apr. 17, 2023).)

On April 20, 2023, Frank timely filed this appeal. Plaintiffs timely cross-appealed on the *Johnson* incentive award issue.

### E.    Standard of review

A district court decision to approve a class-action settlement is reviewed for abuse of discretion. *Johnson*, 975 F.3d at 1251 n.2 (11th Cir. 2020); *Day v. Persels & Assocs., LLC*, 729 F.3d 1309, 1316 (11th Cir. 2013).

"A district court by definition abuses its discretion when it makes an error of law." *Koon v. U.S.*, 518 U.S. 81, 100 (1996). Or if it "applies the law in an unreasonable or incorrect manner." *Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1216 (11th Cir. 2009). Or if it "follows improper procedures in reaching its decision." *Johnson*, 975 F.3d at 1251 n.2 (internal quotations and alterations omitted). Or if it fails to provide a "reasoned response" to objections to settlement approval. *Id.* at 1262. Or if it relies too heavily on irrelevant factors. *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (*en banc*). Or if it "fails to afford consideration to relevant factors that were due significant weight" or where "it considers the proper factors but balances them unreasonably." *Id.* (citing cases).

The determination of whether CAFA applies to a settlement and whether a settlement instrument is a "coupon" for purposes of CAFA is a question of statutory interpretation reviewed *de novo*. *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 604 (9th Cir. 2021); *cf. Wright Transp., Inc. v. Pilot Corp.*, 841 F.3d 1266, 1270 (11th Cir. 2016).

Review is subject to more searching scrutiny yet where, as here, parties negotiate the settlement before class certification. *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 786-800, 805 (3d Cir. 1995). In appellate review, courts must recognize that "the class settlement process is more susceptible than adversarial adjudications to certain types of abuse." *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1983) (internal quotation omitted).

## Summary of Argument

This is an upside-down settlement where the attorneys received $2.6 million, but the class got only coupons with a face value of $1.75 million (and 97% of the class will receive nothing new). But the district court approved a settlement releasing past damages claims because of benefits it ascribed to the settlement paid before the fairness hearing, and because of prospective injunctive relief applying to class members and non-class members alike.

*Williams v. Reckitt Benckiser LLC*, 65 F.4th 1243 (11th Cir. 2023), requires reversal here. As in *Williams*, the district court failed to consider its Article III jurisdiction; as in *Williams*, the district court adjudicated claims over injunctive relief that no plaintiff had Article III standing to bring, and claims over materially different products that no plaintiff alleged they had purchased. *Id.* at 1254-61. *See* Section I below. And also

like *Williams*, the district court neglected the objector's arguments and cited precedents about Fed. R. Civ. P. 23(e)(2)(C) and the clear-sailing and reverter "red flags" in this settlement. *Id.* at 1261 (citing *Briseño*, 998 F.3d 1014). *See* Sections II and III.A below.

The district court committed additional errors. J&J refunded $9.3 million to aerosol purchasers before the case settled (and another $244,000 before settlement notice went out). J&J allegedly spent $80 million on its pre-settlement recall. Neither can be counted as a settlement benefit: the class would have "received" those "benefits" whether or not the case settled, whether class members opt out, and even if the district court had dismissed the case the day before settlement. But the district court ascribed a settlement value of about $7.5 million without explaining how it reached a figure absent from the parties' briefs. This is legal error. *See* Section III.B below.

Non-exclusive prospective injunctive relief that benefits opt-outs and non-class members the same as class members cannot possibly be consideration for the release of retrospective damages claims. "The fairness of the settlement must be evaluated primarily on how it compensates class members—not on whether it provides relief to other people." *In re Dry Max Pampers Litig.*, 724 F.3d 712, 720 (6th Cir. 2013) (quoting *Synfuel Tech., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006)). The district court did not explain why it held otherwise. *See* Section III.B.3 below.

16

28 U.S.C. §1712 establishes procedures for adjudicating the fairness and fees and valuation in coupon settlements: courts must value coupons at their redemption rate, not at their face value, because they frequently expire unused and worthless. The $4.98 instruments given to claimants cannot evade the plain language of the statute simply because the settlement papers call them "vouchers" instead of "coupons." But the district court performed no analysis under 28 U.S.C. §1712 and did not mention the redemption rate. *See* Section IV below.

Finally, the district court, while repeatedly erroneously failing to give a "reasoned response" to Frank's objections (*Johnson,* 975 F.3d at 1262), instead considered several factors common to all class-action settlements as a reason to approve *this* class-action settlement. These are both reversible errors. *See* Section V below.

## Argument

## I. Because plaintiffs did not demonstrate Article III standing to seek prospective injunctive relief, the district court did not have jurisdiction to adjudicate a settlement releasing those claims.

As detailed in the Jurisdictional Statement, the district court erroneously failed to conduct an Article III standing analysis. *Williams*, 65 F.4th at 1254; *Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019). If plaintiffs "lack Article III standing to pursue their claims against [J&J] for

injunctive relief"; then the district court lacked jurisdiction to approve the settlement. *Williams*, 65 F.4th at 1254, 1256.

The complaint, *Serota* Dkt.4, "alleges only *past* harm as a result of [defendant's] misrepresentations." *Williams*, 65 F.4th at 1254. "But '[t]he fact that [the Named Plaintiffs] may have been injured by [J&J's misleading statements and omissions] in the past . . . cannot be sufficient to establish an injury in fact that would support injunctive relief.'" *Id.* (*quoting Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1271-72 (11th Cir. 2015)). As in *Williams*, plaintiffs allege only speculative future harm "plainly insufficient to establish a threat of imminent or actual harm." *Id.* at 1254-55 (discussing *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)). Unspecified plans to buy products cannot "be characterized as a 'concrete' or 'actual' injury because, by its very terms, it has not yet occurred, and indeed may never occur." *Duty Free Ams.*, 797 F.3d at 1272.

Here, plaintiffs allege that they will suffer future harm only (1) ***if*** they "encounter" J&J sunscreen products in the future; ***and*** (2) those products still ***potentially*** contain benzene; ***and*** (3) plaintiffs ***may*** mistakenly rely on the product's label to believe the products no longer contain benzene. *Serota* Dkt.4 at 25 ¶ 49. "The conditional nature of the[] allegations compels the conclusion: any alleged harm … is 'conjectural [and] hypothetical,' not 'actual or imminent,' as Article III demands." *Williams*, 65 F.4th at 1255 (*quoting Lujan*, 504 U.S. at 560).

The fact that the Complaint repeatedly asserts that there is no safe level of benzene in sunscreen only strengthens an argument for a lack of standing here. The proposed injunctive relief allows for 1 ppm in finished sunscreen products (and ended testing of finished products before the fairness hearing). Such a product that would be "worthless" to class members based on their allegations in the Complaints, just as in *Williams*. "The only products that the Named Plaintiffs arguably express any interest in purchasing are products that do not yet exist, and may never exist—a plainly insufficient expression of future harm to confer Article III standing." *Id.* at 1255-56 (citing *Duty Free Ams.*, 797 F.3d at 1272).

If the district court lacked Article III jurisdiction over the claims for prospective injunctive relief claims, it lacked jurisdiction to approve a settlement that included settlement of those claims. *Williams*, 65 F.4th at 1256-58. This Court would thus be "required to vacate the district court's approval of the Settlement Agreement and remand this case to the district court for further proceedings." *Id.* at 1258. "[O]n remand, the court should account only for relief that the Named Plaintiffs have standing to pursue and that it has jurisdiction to grant when assessing the overall fairness of any settlement." *Id.*

Furthermore, "there is some question as to whether any Named Plaintiff has standing to raise certain claims of misrepresentations regarding" non-aerosol products covered by the settlement and

complaint. *Williams*, 65 F.4th at 1260. "None of the Named Plaintiffs alleges that he or she purchased [these] Product[s]." *Id.*; *Serota* Dkt.4 at 3-10; *cf.* Dkt. 55-9 at 12 ¶22. And class counsel conceded that the litigation over non-aerosol products would be materially different from the litigation over aerosol products. Dkt.55 at 30-31; Tr. 43. A lack of standing on this ground would also independently preclude jurisdiction to approve the settlement releasing claims of those class members. *Williams*, 65 F.4th at 1259-61; *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279-81 (11th Cir. 2000).

Thus, as in *Williams*, this Court should vacate and remand. But as discussed below, the district court made several errors in evaluating the settlement, and, as in *Williams*, this Court should give guidance for the district court's review of any new settlement on remand.

## II.   Because of agency problems in class-action settlements, Rule 23(e)(2)(C) requires scrutiny to prevent class counsel from self-dealing at the expense of absent class members and to ensure fair allocation of benefits regardless of the settlement size.

### A.   The district court erred as a matter of law when it failed to address Rule 23(e)(2)(C) factors not listed in *Bennett*.

The 2018 amendments to Rule 23(e)(2) created a new list of elements district courts must consider before approving a class-action settlement. The Eleventh Circuit has long had a six-factor test for evaluating settlement fairness. *Bennett v. Behring Corp.*, 737 F.2d 982,

986 (11th Cir. 1984). That test generally adheres to the new requirements of Rules 23(e)(2)(A), (B), and (C)(i), none of which are at issue in this appeal.

But the 2018 amendments also added, among other things, Rules 23(e)(2)(C)(ii), requiring evaluation of "the effectiveness of any proposed method of distributing relief to the class," and (C)(iii), requiring evaluation of settlement fairness with respect to "the terms of any proposed award of attorney's fees." Even before the 2018 amendments, this Court recognized that satisfying the six-factor *Bennett* test was necessary, but not sufficient, to withstand appellate review. *E.g.*, *Piambino v. Bailey*, 757 F.2d 1112 (11th Cir. 1985).

The lower court here noted its duty to assess the settlement under Rule 23(e)(2), Dkt.95 at 19, but did not actually analyze the settlement under Rule 23(e)(2)(C)(ii) or (iii), *id.* at 22-23. This by itself was reversible error. *Williams*, 65 F.4th at 1261 (ordering the district court on remand to "consider the impact of Congress' 2018 amendments to Rule 23(e)(2)(C) on its analysis of the fairness of a class-action settlement"). And the lower court also did not address the specific objections of Frank that the settlement did not satisfy Rule 23(e)(2)(C). The failure to "set forth on the record a reasoned response to … objections" itself also independently warrants a remand. *Johnson*, 975 F.3d at 1262.

But this Court can go beyond asking the district court to apply the correct standard of law and to make a reasoned response to objections.

As discussed in Section III below, the settlement violated Rule 23(e)(2)(C) as a matter of law. The Court can vacate approval and remand with guidance for a lower court should apply Rule 23(e)(2)(C). The settlement here, which waives the retrospective damages claims of class members, paid class counsel $2.6 million but class members will receive at most $1,750,000 of benefit if they redeem every single one of their voucher coupons—and they won't. *See* Section IV below. (There is also prospective injunctive relief but, as discussed below in Section III, that injunctive relief applies to class members and non-class members alike, and cannot be a settlement benefit, even if there were standing to pursue it.)

If the settling parties created a $4.35 million common fund, Rule 23 would not permit class counsel to extract over half of the common fund in fees. There is no reason to approve such an unfair distribution because the parties instead structured the settlement to mask the class's recovery and segregate the proposed fees from the proposed class recovery.

## B.    Rule 23(e)(2)(C) requires courts to be wary of the allocation of a class-action settlement.

To protect members of the class who are not parties to the settlement agreement, courts have a duty to ensure that class counsel have not unfairly bargained away the rights of those absent class members. Unlike settlements in other civil litigation, class-action settlements require court approval under Rule 23's standards. "The parties to an ordinary settlement bargain away only their own rights—

which is why ordinary settlements do not require court approval. In contrast, class-action settlements affect not only the interests of the parties and counsel who negotiate them, but also the interests of the unnamed class members who by definition are not present during the negotiations." *Pampers*, 724 F.3d at 715. To "guard against settlements that may benefit the class representatives or their attorneys at the expense of the absent class members," the district court must act as a fiduciary for the class and apply "careful scrutiny" to the proposed settlement. *Holmes*, 706 F.2d at 1147; *accord Piambino*, 757 F.2d at 1139; *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1215-16 (5th Cir. 1978) (commanding district courts to "always consider the possibility that an agreement reached by the class attorney is not in the best interest of the class" and to beware of settlements that enrich class counsel more than they do the absent class).

The lower court's approval order failed to grasp this foundational premise of class-action settlements. The order repeatedly made inapt comparisons to private parties negotiating larger fees with their lawyers. Dkt.95 at 25 & n.6. In reality, almost the entirety of any class have never met their lawyers, let alone negotiated fee arrangements with them. And they likely are not even aware that their legal cause of action is being bargained away. Relevant to the order's mistaken analogies, class counsel do not have a legal right to fees deriving from private contract as is the case in a normal non-class representative context. Rather, they

receive fees subject to their equitable entitlement to them. *See*, *e.g.*, *Arkin v. Pressman*, 38 F.4th 1001, 1012 (11th Cir. 2022). This legally erroneous premise was additional reversible error. *See* Section V below.

Every dollar reserved to the class is a dollar defendants cannot pay class counsel, so naturally, a conflict of interest can emerge. Because defendants are interested only in disposing of the total claim asserted and "are uninterested in what portion of the total payment will go to the class and what percentage will go to the class attorney," they "operate[] as no brake against the invidious effects of such a conflict of interest." *Piambino*, 757 F.2d at 1143; *accord Pearson*, 772 F.3d at 787. Thus, while class counsel and defendants have proper incentives to bargain effectively over the size of a settlement, they have no such constraints on allocating it between the payments to class members and the fees for class counsel—unless courts police that allocation. *Pampers*, 724 F.3d at 717.

The new Rule 23(e)(2) reinforces this. A settlement can be at arm's length (satisfying Rule 23(e)(2)(B)) and large enough to reflect the fair settlement value of the litigation (satisfying Rule 23(e)(2)(C)(i)). But a settlement must also satisfy Rule 23(e)(2)(C)(iii). When, as here, class counsel use negotiated fee provisions to favor themselves over their clients, a district court has a legal obligation to reject the proposed settlement, even when negotiated at arm's length. *Piambino*, 757 F.2d at 1139; *Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021); *Briseño v.*

*Henderson*, 998 F.3d 1014 (9th Cir. 2021); *see also Pampers*, 724 F.3d at 721; *Pearson v. NBTY, Inc.*, 772 F.3d 778, 786-87 (7th Cir. 2014); *Bluetooth*, 654 F.3d at 948-49.[4]

Class counsel can structure a settlement to contain illusory relief that obscures the true allocation of the class relief by artificially inflating the settlement's apparent value. The illusion of a large settlement benefits both class counsel and a defendant: "The more valuable the settlement appears to the judge, the more likely the judge will approve it. And the bigger the settlement, the bigger the fee for class counsel." Howard M. Erichson, *How to Exaggerate the Size of Your Class Action Settlement*, DAILY JOURNAL (Nov. 8, 2017).[5] Without judicial oversight to weed out such practices, class members are left with disproportionate settlements in which class counsel recovers far more than the 20-to-30-

---

[4] Courts have sometimes imprecisely referred to disproportional results as a sign of "collusion." *Briseño*, 998 F.3d at 1026. In fact, adversarial arm's-length self-dealing can lead to the same impermissible results. "[T]he incentives for the negotiators to pursue their own self-interest … can influence the result of the negotiations without any explicit expression or secret cabals." *Roes v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1050 n.13 (9th Cir. 2019) (cleaned up) (district court's finding that settlement was non-collusive was necessary, but not sufficient for settlement approval where class would not receive most of the purported relief).

[5] *Available at* https://www.dailyjournal.com/articles/344700-how-to-exaggerate-the-size-of-your-class-action-settlement.

percent benchmark set by this Court. *See* Howard Erichson, *Aggregation as Disempowerment*, 92 NOTRE DAME L. REV. 859 (2016); *cf. Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774-75 (11th Cir. 1991) (outlining 20-30% benchmark).

Consider the likelihood of settlement approval if class counsel openly sought approval of a common-fund cash settlement of $4.35 million that paid the lawyers $2.6 million but the class collectively only $1.75 million—as this settlement ultimately does in a best-case scenario. Few judges would approve that allocation, and precedent forecloses that result. *See*, *e.g.*, *Redman v. RadioShack Corp.*, 768 F.3d 622, 630-32 (7th Cir. 2014) (55%-67% allocation unfair); *Bluetooth*, 654 F.3d at 947-49 (disproportionate fee award is a hallmark of an unfair settlement). For the attorney fee and deal to have any chance of court approval, it must conceal this result. So settling parties create hypothetical class recoveries and difficult-to-calculate "benefits" that ultimately have little value to the class but are cheap for defendants to provide. These hypothetical recoveries that the class never receives then get a high price tag that artificially inflates the overall "value" of the settlement package that the judge sees.

Coupon settlements are a notorious tool for crafty class counsel. Defendants favor coupons because they get to pay pennies on the dollar by awarding their own products and services at cost while "paying out" at retail prices. Coupons can also act as a form of advertising or revenue

generators for defendants where, as here, the claimant ultimately must pay out more than the value of the coupon to redeem it and purchase a whole product. Even worse, the settling parties know that nearly all coupons will never be redeemed and, in effect, those "funds" revert to the defendant. This all creates an illusory value for the settlement for which class counsel can base their fees in front of an unsuspecting judge.

Because of "the[se] well-documented problems associated with such settlements Congress voiced its concern over coupon settlements when it amended [CAFA] to call for judicial scrutiny of attorneys' fee awards in coupon cases." *Reed v. Cont'l Guest Servs. Corp.*, No. 10 Civ. 5642, 2011 WL 1311886, at *3 (S.D.N.Y. Apr. 4, 2011). Because of the inherent dangers of coupon settlements, CAFA requires a district court to apply "heightened judicial scrutiny" and to value the settlement, at least for fee purposes, based "on the value to class members of the coupons that are redeemed," 28 U.S.C. § 1712(a). *See also McKinney-Drobnis*, 16 F.4th at 602. The Senate Committee's Report on CAFA confirms these legislative aims:

> [W]here [coupon] settlements are used, the fairness of the settlement should be seriously questioned by the reviewing court where the attorneys' fee demand is disproportionate to the level of tangible, non-speculative benefit to the class members. In adopting [Section 1712(e)'s requirement of a written determination that the settlement is fair, reasonable, and adequate], it is the intent of the Committee to

>incorporate that line of recent federal court precedents
>in which proposed settlements have been wholly or
>partially rejected because the compensation proposed to
>be paid to the class counsel was disproportionate to the
>real benefits to be provided to class members.

S. Rep. 109-14, at 31 (2005), as reprinted in 2005 U.S.C.C.A.N. 3, 32.

The way to ameliorate this problem is to motivate counsel to seek out absent members by tying fees to the amounts the class actually receives. As long as class counsel can maintain the illusion of an amount "made available" that justifies their fee award, and defendants can buy peace at a fraction of that amount, class counsel has every incentive to structure a settlement so that their putative clients will neither make claims nor receive cash. *Pearson*, 772 F.3d at 781, 783 (discussing proper incentives of an actual-recovery valuation rule and perverse incentive of potential-recovery valuation rule). As Section III below discusses, Rule 23(e)(2)(C)(ii) requires courts to see through that illusion.

Injunctive relief is yet another tool that enables class counsel and the defendant to inflate the perceived value of the settlement. The value of injunctive relief is "easily manipulable by overreaching lawyers seeking to increase the value assigned to a common fund." *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003). Defendants benefit from res judicata following judicial approval of the settlement and the minimal cost of that relief, while class counsel hopes for approval of a higher fee request. The critical question for a reviewing court is whether the change

achieved by the settlement benefits class members as class members. *See* Section III below.

When courts fail to insist that settling parties compensate the class for their injuries, settlements will look like the one here: class members' collective recovery limited to coupons of questionable value; attorneys' fees wildly disproportionate to the actual payout to the class, shielded from appellate review by self-dealing "clear-sailing" and "kicker" clauses; and injunctive relief divorced from the claims of class members. *E.g.*, *Briseño*; *Roes*; *Pearson*; *Redman*; *Pampers*; *Bluetooth*. The settlement here has all these telltale signs, a "bevy of questionable provisions." *Briseño*, 998 F.3d at 1018. Exacerbating the problems, the settlement includes a "clear-sailing" clause under which the defendant agreed not to challenge the attorneys' fees as well as a "kicker" so that any reduction in the fee award reverts to defendants rather than the class or, as here, never leaves J&J's pockets. "The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees." *Bluetooth*, 654 F.3d at 949. And worse, it prevents the court from correcting the misallocation of the settlement relief by returning excessive fees to class members.

The vitality of the class-action mechanism depends on rigorous scrutiny by the judiciary and the application of doctrinal tests that

properly align the incentives of class counsel with those of the vulnerable, absent class members whose claims they settle away.

The district court's scrutiny failed to meet this standard and, as a result, it overlooked the red flags of settlement unfairness appellate courts have identified.

## III. The settlement approval cannot stand because class counsel negotiated $2.6 million for themselves in a settlement that provides the class likely less than $1 million of redeemed value in coupon relief.

The settlement here will distribute coupons with a face value of $1.75 million but which will likely provide less than half that to the class; other provisions supposedly worth millions or tens of millions are illusory as a matter of law because they do not act as consideration for the settlement release. Meanwhile, class counsel negotiated for itself a $2.6 million payday, shielded by a clear-sailing agreement and a segregated fund. This settlement is a prime example of a "sharp professional practice" of attorneys "us[ing] the class action procedure for their personal aggrandizement." *Piambino*, 757 F.2d at 1144 (internal quotations and citation omitted); *accord Arkin*, 38 F.4th 1001, 1011 (class counsel may not "subordinate[] the interests of the class to its own interests"); *Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship*, 874 F.3d 692, 697-98 (11th Cir. 2017) (similar). Every appellate court to

consider the 2018 amendments rejects this scenario in a settlement where class members are waiving and compromising damages claims.

### A.    Disproportionate allocation violates Rule 23(e)(2)(C) even without a showing of actual collusion.

Rule 23 requires courts to consider defects of allocation between the class and class counsel as part of their fairness review. Courts must consider among other things, whether "the relief provided for the class is adequate, taking into account … the terms of any proposed award of attorney's fees." Fed. R. Civ. Pro. 23(e)(2)(C)(iii). A review that includes these factors is imperative to suss out any self-dealing on the part of the settling parties. The lower court erred as a matter of law in approving the settlement without considering or addressing Frank's objections based on these issues. *Johnson*, 975 F.3d at 1262 (requiring "reasoned response" "proportional to the specificity" of objections (internal quotations omitted)). *Compare* Dkt.83 at 16-23 *with* Dkt.95 at 22-23.

Instead, the lower court announced that it must consider the Rule 23(e)(2)(C) factors before retreating into two paragraphs of "analysis" respecting the risks involved in the litigation, wrongly stating that "when considering these factors, courts will look to "the degree of case development that class counsel have accomplished prior to settlement" to ensure that "counsel had an adequate appreciation of the merits of the case before negotiating," and concluding "Class Counsel had a clear view of the strengths and weaknesses of the case before agreeing

to … the settlement." Dkt.95 at 22-23 (quoting *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1348 (S.D. Fla. 2011)). But those considerations have nothing to do with 23(e)(2)(C). The court's cite of *In re Checking Account Overdraft Litig.*, shows that it was really addressing the third *Bennett* factor: the stage of the proceedings and the amount of discovery complete.

While the lower court needed to conduct a *Bennett* factor analysis, that analysis is separate from its Rule 23(e)(2) review. *In re Equifax Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1273 (11th Cir. 2021) (courts must review class settlements for fairness under Rule 23(e)(2) and "several additional factors called the *Bennett* factors"). Whether the lower court wrongly conflated or substituted *Bennett* factors for those expressly laid out in the Rule's text, it failed apply the correct rule of law and thus to conduct the required analysis. This alone is sufficient for reversal. (For another example, rather than do a complete Rule 23(e)(2) analysis, the court misapplied a single *Bennett* factor and found it "nearly dispositive" for its decision to approve the settlement. Dkt.95 at 23. This was independent error. *See* Section V below.)

Had the lower court conducted the correct analysis and correctly valued the settlement, it would not have approved the settlement given the self-dealing it contained. *Cf. Williams*, 65 F.4th at 1261 (noting need for district courts to consider signs of self-dealing, citing *Briseño* and *Pearson*). Impermissible self-dealing can occur without the settling

parties explicitly conniving in a smoke-filled room to unfairly treat the class. Arm's-length negotiations protect the interests of the class only with respect "to the amount the defendant will pay, not the manner in which that amount is allocated between the class representatives, class counsel, and unnamed class members." *Pampers*, 724 F.3d at 717.

Thus, courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests … to infect the negotiations." *Bluetooth*, 654 F.3d at 947. Rather than explicit collusion, there need only be acquiescence for such self-dealing to occur: "a defendant is interested only in disposing of the total claim asserted against it" and "the allocation between the class payment and the attorneys' fees is of little or no interest to the defense." *Id.* at 949 (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003) and *GM Trucks*, 55 F.3d at 819-20); *accord Briseño*, 998 F.3d at 1025; *Pearson*, 772 F.3d at 783. To this end, Rule 23(e)(2) has separate subparts to ensure *both* an arms' length negotiation ((e)(2)(B)) *and* effective and proportionate relief distribution and fee allocation without self-dealing terms ((e)(2)(C)(ii) and (iii)).

The self-dealing here not only included a disproportionate fee, but a clear-sailing agreement and a segregated fund for the proposed attorneys' fees. These are convincing indications of a lawyer-driven settlement *See generally Williams*, 65 F.4th at 1261; *Briseño*, 998 F.3d at 1026-27; *accord Pearson*, 772 F.3d at 786-87; *Piambino*, 757 F.2d at 1122.

Any objection to an excessive fee request would be for the benefit of the defendant, rather than the class member, ensuring along with the clear-sailing agreement that no one would have appellate standing to challenge a fee award—unless that class member challenges the settlement as a whole. The combination is "a strategic effort to insulate a fee award from attack." Charles Silver, *Due Process and the Lodestar Method*, 74 TULANE L. REV. 1809, 1839 (2000); *accord Briseño*, 998 F.3d at 1027; *Pearson*, 772 F.3d at 786-87.

Despite Frank's efforts (Dkt.83 at 11; Tr. at 42:1-42:10), the lower court allowed its finding that arm's-length negotiations occurred to short-circuit its inquiry over whether class counsel had unfairly treated the class with its own self-dealing, (Dkt.95 at 21-22). It is Rule 23(e)(2)(B) that addresses the question of arm's-length dealing. But, again, satisfying one subpart of Rule 23(e)(2) is necessary, but not sufficient, and does not fulfill a court's obligation to evaluate the other inquiries Rule 23(e)(2) requires.

This is by itself reversible error requiring remand even if this Court is unwilling to hold on its face unreasonable a settlement that class counsel proposes to pay the attorneys much more than what the class will receive. A settlement that pays class members coupon relief likely worth less than $1 million is not worth the around $7.5 million the Court credited it.

Nothing contained in the settlement justifies the disproportionate fee paid to class counsel. Of course, class counsel knew this all along. They originally argued in their fee papers the common fund—to include all forms of relief, notice costs, and their fees and expenses—amounted to "a minimum of" $4.85 million. Dkt.77 at 2. Then, two weeks later in their final approval papers, class counsel told the lower court the settlement should be "conservatively value[d] [at] more than $80 million dollars." Dkt.82 at 8. This 16-fold increase over a fortnight was shocking given there were no intervening changes to the structure of the settlement. But with the exaggeration, class counsel could now proudly declare that their fee request had plummeted from a facially problematic 50% share to a mere 3% sliver of the suddenly massive putative $80 million settlement pie. *Id.* at 10 n.4.

## B.    The district court's unexplained settlement valuation is legally erroneous.

The lower court adopted none of these figures. It is hard to decipher from the approval order what value the lower court placed on the settlement overall, let alone how it valued the various proposed forms of relief. The lone clue is the court's statement that the $2.5 million fee request it granted "will represent approximately one-third of the common fund." Dkt.95 at 28. Arithmetic thus suggests the court thought that the settlement was worth about $7.5 million, as $7.5 million divided by three

is $2.5 million.[6] This is wrong. Breaking down the various forms of relief shows the settlement provides, at best, around $1 million in redeemed coupon relief to the class, and any valuation above $2 million would be legally erroneous.

### 1. The vouchers are worth less than face value because many, and perhaps most, coupons will not be redeemed.

*First*, the vouchers, which expire valueless if not used within a year, will not be worth their $1.75 million dollar face value. It is the burden of the proponents of the settlement to prove that the voucher has actual value for consumers. *Pampers*, 724 F.3d at 719 (citing authorities). But the settling parties have failed to even meet the burden of production. For example, J&J could have provided internal data for how it accounted for the voucher value under GAAP, or a settlement administrator could testify as to historical redemption rates for coupons of this size and a one-year expiration date with a limited range of products for discounts. But the parties introduced no such information or evidence. Instead, the class

---

[6] Not only did the lower court fail to elaborate on how it derived this number, neither party advocated for such a valuation, and there was no reference to a $7.5 million valuation from anyone, the court included, at the fairness hearing. *See*, *e.g.*, Tr. 33:9-22. We don't know if the $7.5 million figure is a discount to the proposed value of the injunctive relief, the coupon relief, the refund, or some combination. But, as we will discuss in this subsection, no legally valid calculation could reach that number.

and the lower court knew nothing other than J&J would distribute coupons of $4.98 face value after *pro rata* reduction to claiming class members capped at $1.75 million face value. Dkt.55-9 at 14-15; Dkt.87 at 11. Given that other coupon settlements have had redemption rates in the 1-4% range (Dkt.83 at 18-19 (citing authorities)), we can readily acknowledge that class members expecting $10.58 coupons are not going to redeem 100% of the $4.98 coupons within the one-year expiration date, and may even redeem less than half of them.

## 2. A refund program that ended before the class received notice is not a settlement benefit.

*Second*, the refund program cannot count as a settlement benefit because it was already available to consumers and never depended on the settlement or its approval. Not even the putative "extension" of the refund program is a benefit, because there was never any announced end date to begin with and nearly every refund was paid before settlement. Nothing in the record suggests that J&J planned to end the refund program before January 14, exactly six months after it began, or that the settlement added anything at the margin. And fewer than 3% of the total claims were made between the settlement date and January 14: class settlement notice couldn't even increase the number of claims, because it went out after the refund program ended. This is why multiple courts of appeals reject crediting settlements with the value of preexisting relief such as refunds provided by a defendant before a settlement agreement

or any other injunction that "does not obligate" a defendant "to do anything it was not already doing." *Koby v. ARS Nat. Svcs., Inc.*, 846 F.3d 1071, 1080 (9th Cir. 2017); *accord In re Groupon Mktg. & Sales Practices Litig.*, 593 F. App'x 699, 702 (9th Cir. 2015); *cf. In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748, 752 (7th Cir. 2011) (class certification inappropriate where defendant already had refund program and plaintiff couldn't achieve additional relief).

Here, J&J voluntarily undertook a recall and refund of all potentially affected sunscreen products on July 14, 2021, some five months before settlement. J&J acknowledged at the fairness hearing that they would have, and did, undertake the recall and refund program in response to the Valisure petition and the public reaction, rather than in response to the litigation. *See* Tr. 20-21, 25-26. In fact, J&J had refunded at least $9,284,264.58 before there was a settlement. Dkt.55-2 at 6 ¶9. (The parties never disclosed the precise figure of payments already made as of the December 17 execution date.) Given the total refund at the end of the program was $9,528,207.62, over 97% of refunds came before there was any settlement. Dkt.82-1 at 10 ¶45.

Because almost all consumers who wished for a refund obtained one before settlement, the release of those claims cannot be based on the receipt of something they already have and were given unconditionally. Put differently, whether the lower court had denied or approved the settlement had no effect on the ability of class members to receive and

possess their refunds. Therefore, it cannot be said the refund resulted from the settlement. Indeed, had the district court dismissed the case on January 15, J&J would not have had to pay fees to class counsel for the benefit to class members.

"Fine," class counsel might argue. "We didn't create the refund but we forced J&J to extend that refund and should be at least created with the value created there." But neither class counsel nor the lower court explained or valued the "extension," perhaps crediting the entire $9,528,207.62 refunded amounts to the settlement. This is wrong: we know that at least $9,284,264.58 pre-dated the settlement and thus any "extension" is worth at most $243,943.04, and likely less. The parties did not meet their burden. *E.g.*, *Pampers*, 724 F.3d at 719 (parties failed to prove that refund program had actual value when they failed to proffer data).

But class counsel not only fail to establish the extension's value, they fail to prove that the settlement even created an "extension." The settlement does not call the January deadline an "extension," but a "continuation." Dkt.55-9 at 13. When J&J announced the refund program, it did not provide or suggest an end date. Without evidence that J&J planned to end its refund program in under six months, there is no evidence that the settlement created any marginal benefit over what the class would receive anyway.

39

Moreover, the refund program ended in January 2022. Class members who relied on class notice to learn about settlement relief could not access the refund program. The class received no additional benefit from the program in exchange for the release that was always contingent on settlement approval. Thus, the refund program cannot be consideration for the waiver of the class's damages claims for past purchases of aerosol products.

3.  **Prospective injunctive relief must benefit the class—not hypothetical future consumers.**

*Finally*, the injunctive relief is not consideration to the class, and thus cannot be considered part of the settlement benefit. "The fairness of the settlement must be evaluated primarily on how it compensates class members—not on whether it provides relief to other people." *Pampers*, 724 F.3d at 720 (quoting *Synfuel Tech., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006)).

The district court, which ignored Frank's references to *Pampers*, apparently did the reverse. In justifying its award of $2.5 million to class counsel, the lower court found "significant value of the changed business practices adopted by [J&J]." Dkt.95 at 29. But outside of that vague, qualitative assessment, which did not distinguish between past purchasers and future purchasers, the court did not provide any actual valuation of the relief.

One can imagine an unambitious state attorney general who claims victory in J&J's temporary agreement to ensure that its supplier of isobutane reduces benzene contamination to 1 ppm. But under Rule 23, "the concept of class actions serving a 'private attorney general' or other enforcement purpose is illegal." S. Rep. No. 109-14, at 58-59 (2005); *cf. also Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 260-69 (1975) (judiciary cannot award fees on non-legislatively sanctioned "private attorney general" model). "The civil judicial system is designed to compensate people who have been wrongfully injured by another's conduct; its purpose is not to supplant the administrative and legislative branches of government through regulation." Victor E. Schwartz & Christopher E. Appel, *Government Regulation and Private Litigation: The Law Should Enhance Harmony, Not War*, 23 B.U. PUB. INT. L.J. 185, 198-99 (2014). Rule 23 is not a substantive bounty-hunting provision that allows class counsel to treat the class as a free-floating entity existing only to permit counsel to operate as a private attorney general. Rule 23 is a procedural joinder device that aggregates real individuals with real claims into a class if certain prerequisites are satisfied. *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010).

This Court has recognized this truth for decades. "The plaintiff-class, as an entity, [is] not Lead Counsel's client in this case. Rather, Lead Counsel continue[s] to have responsibilities to each individual member of the class even when negotiating." *Piambino*, 757 F.2d at 1144 (internal

quotation omitted). The class device works with the judiciary in its role of "providing relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (2016) (Roberts, C.J., concurring) (cleaned up). Here, the settlement does not direct injunctive relief to the class, but to future purchasers (class members and non-class members alike) with no benefit to class members who stopped doing business with J&J.

Class members' release of their claims must be fair. That the defendant might suffer costs or the public at large might allegedly benefit from an injunction does not affect fairness under Rule 23 within proceedings bound by Article III jurisdictional limits. Final approval waives the rights of class members, who are *past purchasers* of J&J products. "Future purchasers are not members of the class, defined as it is as consumers who have purchased [the product]." *Pearson*, 772 F.3d at 786. Thus, undirected prospective relief, such as changing the defendants' testing of future supply chains, cannot make a settlement in which a class releases its past damages claims fair. *See also generally* Erin L. Sheley & Theodore H. Frank, *Prospective Injunctive Relief and Class Settlements*, 39 HARV. J. L. & PUB. POL'Y 769, 778-80 (2016).

Even if the injunctions impose significant costs on J&J, those costs are not the measure of compensable value. The standard under Rule 23(e) "is not how much money a company spends on purported

benefits, but the value of those benefits to the class." *Bluetooth*, 654 F.3d at 944 (quoting *In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 423 (N.D. Cal. 2009) (Walker, J.)). It is "egocentrism" to assume that the class members are concerned about the costs incurred by J&J. *Pampers,* 724 F.3d at 720; *accord Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004) (putting defendant out of business not valuable to class members).

Indeed, J&J would have incurred these costs independently of the settlement because of the preexisting recall. To artificially inflate the valuation of the settlement to support an exorbitant attorney's fees payout, class counsel is including necessary expenditures by J&J that stem from J&J's day-to-day business operations. These costs are epiphenomenal and predetermined, resulting from the recall, not the settlement, and not the product of litigation. J&J admitted this at the fairness hearing. Tr. 21-22.

Despite this admission, the lower court rejected Frank's argument that plaintiffs were ascribing settlement value to voluntary actions of J&J independent of the settlement. Saying there was "zero evidence" to support the argument, the court relied solely on the fact that the first complaint predated J&J's recall. Dkt.95 at 24. Other than this "*post hoc, ergo propter hoc*" reasoning, neither the court nor class counsel provided any evidence that the *Serota* complaint, rather than press coverage or the threat of FDA action or J&J's own interests in providing a satisfactory

43

customer experience, caused its actions. Nor do federal courts recognize catalyst theory, and neither the parties nor the court suggested any authority for the proposition. The question is always one of consideration for the release, and if the class would receive the benefits even if there were no settlement, and even if they opt out from the settlement, those benefits cannot possibly be consideration for the class's release. *E.g.*, *Koby*, 846 F.3d at 1080.

Frank does not argue that a class may *never* benefit from prospective injunctive relief. Injunctions can direct relief to a class in many ways. For example, a 23(b)(2) civil-rights claim may seek to change the future behavior of a governmental body or an employer for a class of individuals who have ongoing relationships with the defendant, like prisoners or city residents exercising their speech rights. Consumer class-action settlements sometimes provide injunctive relief that directs relief targeted specifically to class members. Similarly, injunctions may provide an improved insurance-claims process or replacements for a defective product. *E.g.*, *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1243-44 (11th Cir. 2011); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998).

Alternatively, class actions can be settled through Rule 23(b)(2) on behalf of consumers who buy J&J in the future without waiving their retrospective damages claims. But that is not what happened here. There was no separate subclass, and, indeed, the past-purchaser class

representatives arguably failed to demonstrate Article III injury in the complaint. And except for the 3% of the class who will receive $4.96 coupons while their attorneys receive millions in cash, class members receive nothing more than any other consumer receives—the dubious benefit of J&J testing supplier products for 1 ppm benzene for two years, even assuming that J&J wouldn't have done that anyway to avoid future recalls.

A couple of hypothetical consumer fraud class-action settlements demonstrate the point. Imagine a settlement of *Benes v. Kramer Non-Fat Yogurt*, where a class sues a shop selling "non-fat yogurt" that turns out to be full of fat. *Cf.* Larry David, "The Non-Fat Yogurt," *Seinfeld* (NBC Nov. 4, 1993). If the parties settled for injunctive relief under which the defendant agreed to provide non-fat yogurt going forward, that would be of no benefit to the class for their ***previous injuries***—even if there happened to be some overlap between the class members and the set of future purchasers of non-fat yogurt. The class members would benefit only if they make additional purchases from the defendant, and that benefit is presumably reflected in the price they pay for those new purchases.

Another example: imagine the hypothetical consumer fraud class action *Gatsby v. West Egg Farms*, where a class sues over West Egg selling dozen-egg containers that have only ten eggs. If the parties settled with injunctive relief that required West Egg to include at least twelve

eggs in every "dozen eggs" package, that again provides no benefit to the class for their previous injuries, even if, once again, there happened to be some overlap between the class members and the set of future purchasers of West Egg packages.

A real counterexample may make this principal more concrete. The settlement in *Faught*—unlike in this case and the hypotheticals above—provided injunctive relief *specifically directed* to class members. The *Faught* class consisted of insurance policy holders allegedly wrongfully denied claims by technicians with financial incentives to deny claims. 668 F.3d at 1237. To remedy this, the injunction required the defendant to accept claims resubmitted by all past and present policy holders, to remove incentives for reviewers to deny claims, and to set up a review board for denied claims. *Id*. at 1238. Such changes direct retrospective relief specifically to class members, even if some changes by chance also benefit future customers.

In comparison, in *Synfuel,* the Seventh Circuit rejected a settlement that included changes to the defendant shipping company's billing practices. 463 F.3d at 654. The Seventh Circuit found that "future customers who are not plaintiffs in this suit [] will reap most of the benefit from these changes." *Id.* The Seventh Circuit noted that the class complaint specifically sought money for overcharges and "the fairness of the settlement must be evaluated primarily based on how it compensates class members for these past injuries." *Id.*

Even still, the lower court could not provide a number value to the injunctive relief provided in the settlement, stating only that its "significant value" supported the award of $2.6 million in attorney's fees. Dkt.95 at 29.

But purported injunctive relief to the class is neither relief, nor is it directed to the class. The parties must prove that the settlement "secures some adequate advantage for the class." *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 195 (5th Cir. 2010). Without class benefit, an injunction cannot make an otherwise disproportionate and inequitable settlement fair. Even if the lawsuit did precipitate the injunction, it must still provide value to the class.

## IV. The settlement's coupon relief mandates applying 28 U.S.C. §1712, and the district court erred in failing to acknowledge the presence of coupon relief in the settlement.

The settlement flunks Rule 23(e) as a matter of law independent of the separate failure of the Court to analyze and apply CAFA. All the same, the Court's failure to do so is a separate ground for reversal. A coupon settlement must be valued on the *redemptions* of coupons, not the $1.75 million face value. 28 U.S.C. §1712(a), (c). But the lower court failed to address the question of how it should apportion any fee award under CAFA because it neglected to apply the statute at all.

"Coupon" is not defined in CAFA and thus must be given its ordinary meaning. *Kouichi Taniguchi v. Kan Pac. Saipan, Ltd.*, 566

U.S. 560, 566 (2012). "[T]he ordinary meaning of 'coupon' encompasses 'any type of award that is not cash or a product itself, but that class members can redeem to obtain products or services or to help make future purchases." *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 612-13 (9th Cir. 2021) (Miller, J., concurring) (quoting *Hendricks v. Ference*, 754 Fed. Appx. 510, 514 (9th Cir. 2018) (Friedland, J., concurring in part and dissenting in part) and citing dictionaries); *but see McKinney-Drobnis*, 16 F.4th at 603-05 (instead applying a judicially invented definition absent from the dictionary and statute). "Coupons are commonly given for merchandise for which no cash payment is expected in exchange." *Dardarian v. Officemax N. Am., Inc.*, No. 11-cv-00947, 2013 U.S. Dist. LEXIS 98653, at *7 (N.D. Cal. July 12, 2013) (quoting WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1988)).

Although the parties here attempt to evade CAFA by using the term "voucher," that term itself is subsumed in the ordinary meaning of "coupon." *Redman v. Radioshack Corp.*, 768 F.3d 622, 635 (7th Cir. 2014). Non-legal sources use the terms interchangeably. So does the legislative history. S. Rep. No. 109-14. So not only does this ordinary meaning of "coupon" track the ordinary meaning of "voucher," *Dardarian*, 2013 U.S. Dist. LEXIS 98653, at *6-7, but Congress intended the terms to be used interchangeably. *Redman*, 768 F.3d at 636. Moreover, the lower court itself referred to the vouchers provided by the settlement as coupons in its approval order and at the fairness hearing. Dkt.95 at 2; Tr.

at 7:1-7:7, 47:10-47:14. The ordinary meaning of "coupons" includes the voucher settlement relief provided here.

The Ninth Circuit imposes its own definition independent of the plain meaning of "coupon." *E.g.*, *McKinney-Drobnis*, 16 F.4th at 603-05. Frank believes this test is atextual, but the result would be the same. Had a court used that multifactor test, all three factors would point to a finding that the vouchers were "coupons." The "vouchers" are worth only $4.98, far less than the price of the upscale sunscreens here; they are good only for the limited array of Neutrogena and Aveena products; and they expire within a year. 16 F.4th at 602, 605. As here, the settlement in *McKinney-Drobnis* provided relief it called "vouchers," but were coupons because they acted like coupons. *Cf. also In re EasySaver Rewards Litig.*, 906 F.3d 747 (9th Cir. 2018) ("e-credits" are coupons).

Of course, as noted above, we have no idea how, or even if, the lower court valued the coupon relief because it provided no CAFA analysis and failed to explain how it arrived at its valuation of about $7.5 million. But because the vouchers are coupon relief subject to the application of CAFA's mandatory attorney's fees provisions and settlement-approval principles, it was legal error for the lower court to make a valuation divorced from findings on redemption value. The settlement approval must be reversed for that reason alone.

**V.    The district court abused its discretion by relying on facts common to all class-action settlements and thus irrelevant to settlement fairness or class certification.**

As mentioned above, the district court repeatedly failed to give a reasoned response to several of Frank's arguments, repeatedly ignoring appellate precedents Frank cited, and often instead criticizing strawman arguments Frank never made. This by itself is reversible error under *Johnson*. But the district court also relied on irrelevant facts that bear no or little weight on whether a class-action settlement satisfies Rule 23(e), compounding its error.

*First*, the court found it "nearly dispositive" that Frank was the only objector. Dkt.95 at 23-24 (quotation and citation to district-court precedent omitted). This is legal error. The "substance and amount of opposition to the settlement" is just a single *Bennett* factor. 737 F.2d at 986. And no matter how all the *Bennett* factors shake out, a settlement must still satisfy the Rule 23(e)(2) requirements. *Equifax*, 999 F.3d at 1273; *cf. Bluetooth*, 654 F.3d at 946 ("consideration of [Ninth Circuit's similar multifactor test] alone is not enough to survive appellate review"; reversing settlement approval because of red flags).

Moreover, it's an abuse of discretion to look only to the "amount of opposition" while disregarding the "*substance*" of the objections. Frank's objection was substantive and raised important statutes, Rules, and precedents that class counsel failed to identify to the court. This *Bennett* factor merely tells courts there's no need to give weight to paper-thin

objections. A meritorious objection doesn't become less meritorious because it's made by a single objector. *E.g.*, *Briseño* (one objector at fairness hearing); *Pampers* (same).

While an outpouring of objections is a factor suggesting widespread dissatisfaction with a settlement, the inverse is not true. It is neither surprising nor probative that only a public-interest law firm filed an objection, given the burdens of objection compared to the benefits in a small-dollar consumer settlement. (To the extent it is probative, it should weigh against approval that a public-interest firm devoted scarce resources to objecting to a particular settlement. Dkt. 83-1 at 32 ¶36.) No class member would have had the financial incentive to pay for postage to file a *pro se* objection much less hire an attorney to investigate whether to produce a substantive objection. Indifference or silence cannot be considered support for the settlement. *Redman*, 768 F.3d at 628 (one objector); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217-18 (5th Cir. 1981).

*Second*, it is irrelevant that class counsel sought smaller fees than what it would cost for class members to individually litigate—much less what Elizabeth Holmes's lawyers charged in a privately negotiated contract. Dkt.95 at 25. *Of course* it's cheaper for attorneys to bring aggregated class litigation instead of individual cases—that's *the whole point* of class actions, which can't be brought under Rule 23(b)(3) if they're not "superior" to other forms of litigation. By the district court's

standard, every (b)(3)-certified settlement satisfies Rule 23(e) no matter the ratio of the fee to the recovery, which is obviously not true. *E.g.*, *Briseño.* Rule 23(e) provides "an additional requirement" beyond Rule 23(b), to "protect[] unnamed class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621, 623 (1997).

No one objected to Holmes's lawyers' fees because *she privately negotiated her retainer in advance* without any effect on third parties; no one except Holmes would have had legal standing to complain. In comparison, absent class members don't get to choose their class counsel in advance and aren't present at the settlement table or when fee requests are drafted, and objections are necessary to protect the due process rights of affected absent third parties when attorneys favor themselves over their clients.

*Third*, it's not a relevant factor that "Claimants availed themselves of top lawyers without leaving their homes or even spending one dime." Dkt.95 at 25. Once again, that's true in nearly every class settlement, and not a grounds for distinguishing class settlements that satisfy Rule 23(e)(2) from those that flunk. It's also clearly erroneous as an economic matter. Every dime paid to class counsel is a dime that the defendant won't pay to class members to settle a case, and thus an economic *cost* to the class, even if the class is not directly "spending" it—

exactly the allocation problem *Williams*, *Briseño*, *Pearson*, Rule 23(e)(2)(C), and Frank's objection identify, and that the district court failed to address.

Such overweight of irrelevant factors at the expense of factors required by the rules is by itself reversible abuse of discretion. *E.g.*, *Irey*, 612 F.3d at 1189.

## Conclusion

Not only did the district court erroneously neglect to consider relevant Rule 23(e)(2) factors and appellate precedents (and Article III), but it instead used reasoning and overweighed factors that do not bear upon settlement fairness. The district court's grant of settlement approval must be vacated, and the case remanded.

Dated:  July 5, 2023                 Respectfully submitted,

                                     /s/ Theodore H. Frank
                                     Theodore H. Frank
                                     John M. Andren
                                     HAMILTON LINCOLN LAW INSTITUTE
                                        CENTER FOR CLASS ACTION FAIRNESS
                                     1629 K Street NW, Suite 300
                                     Washington, DC 20006
                                     Telephone: (703) 203-3848
                                     Email:  ted.frank@hlli.org

                                     Attorneys for
                                        Appellant/Cross-Appellee
                                        Theodore H. Frank

## Addendum of Statutes and Rules

**Federal Rule of Civil Procedure 23. Class Actions.**

**(e)   Settlement, Voluntary Dismissal, or Compromise.**
The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

…

(2) *Approval of the Proposal.* If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

…

## 28 U.S.C. § 1712. Coupon settlements

(a) CONTINGENT FEES IN COUPON SETTLEMENTS.—If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed.

(b) OTHER ATTORNEY'S FEE AWARDS IN COUPON SETTLEMENTS.—

(1) IN GENERAL.—If a proposed settlement in a class action provides for a recovery of coupons to class members, and a portion of the recovery of the coupons is not used to determine the attorney's fee to be paid to class counsel, any attorney's fee award shall be based upon the amount of time class counsel reasonably expended working on the action.

(2) COURT APPROVAL.—Any attorney's fee under this subsection shall be subject to approval by the court and shall include an appropriate attorney's fee, if any, for obtaining equitable relief, including an injunction, if applicable. Nothing in this subsection shall be construed to prohibit application of a lodestar with a multiplier method of determining attorney's fees.

(c) ATTORNEY'S FEE AWARDS CALCULATED ON A MIXED BASIS IN COUPON SETTLEMENTS.—If a proposed settlement in a class action provides for an award of coupons to class members and also provides for equitable relief, including injunctive relief—

(1) that portion of the attorney's fee to be paid to class counsel that is based upon a portion of the recovery of the coupons shall be calculated in accordance with subsection (a); and

(2) that portion of the attorney's fee to be paid to class counsel that is not based upon a portion of the recovery of the coupons shall be calculated in accordance with subsection (b).

(d) SETTLEMENT VALUATION EXPERTISE.—In a class action involving the awarding of coupons, the court may, in its discretion upon the motion of a party, receive expert testimony from a witness

56

qualified to provide information on the actual value to the class members of the coupons that are redeemed.

(e) JUDICIAL SCRUTINY OF COUPON SETTLEMENTS.—In a proposed settlement under which class members would be awarded coupons, the court may approve the proposed settlement only after a hearing to determine whether, and making a written finding that, the settlement is fair, reasonable, and adequate for class members. The court, in its discretion, may also require that a proposed settlement agreement provide for the distribution of a portion of the value of unclaimed coupons to 1 or more charitable or governmental organizations, as agreed to by the parties. The distribution and redemption of any proceeds under this subsection shall not be used to calculate attorneys' fees under this section.

## Certificate of Compliance

This brief complies with the type-volume limitation of Fed. R. App. Proc. 32(a)(7)(B) because this brief contains 12,357 words, excluding the parts of the brief exempted by 11th Cir. R. 32-4, as counted by Microsoft Word.

This brief complies with the typeface requirements of Fed. R. App. Proc. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Executed on July 5, 2022          */s/ Theodore H. Frank*
                                  Theodore H. Frank

58